BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General, Civil Division
AMANDA N. LISKAMM
Director, Consumer Protection Branch
LISA K. HSIAO
Assistant Director
DANIEL K. CRANE-HIRSCH (MA Bar No. 643302; NY Bar No. 4151015)
Senior Trial Attorney
MATTHEW A. ROBINSON (DC Bar No. 1780280)
ZACHARY A. DIETERT (DC Bar No. 1003784)
Trial Attorneys
Consumer Protection Branch
Civil Division, U.S. Department of Justice
450 5th Street, NW, Suite 6400-South
Washington, DC 20044-0386
Telephone:   (202) 305-4342 (Robinson)
                    (202) 616-9027 (Dietert)
                    (202) 646-8242 (Crane-Hirsch)

Attorneys for Plaintiff United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STRATICS NETWORKS INC., A CORPORATION,<br><br>NETLATITUDE, INC., A CORPORATION,<br><br>KURT HANNIGAN, INDIVIDUALLY AND AS AN OFFICER AND OWNER | Case No.:   **'23CV0313 BAS KSC**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, CIVIL PENALTIES, AND OTHER RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

OF NETLATITUDE, INC.,

ATLAS MARKETING PARTNERS, INC., A CORPORATION,

ATLAS INVESTMENT VENTURES LLC, A LIMITED LIABILITY COMPANY,

KASM, A CORPORATION, ALSO D/B/A KASM, INC.,

TEK VENTURES, LLC, A LIMITED LIABILITY COMPANY, ALSO D/B/A PROVIDENT SOLUTIONS,

ACE BUSINESS SOLUTIONS LLC, A CORPORATION,

ERIC PETERSEN, INDIVIDUALLY AND AS AN OFFICER AND OWNER OF ATLAS MARKETING PARTNERS, INC., ATLAS INVESTMENT VENTURES LLC, AND TEK VENTURES, LLC,

TODD DIROBERTO, INDIVIDUALLY AND AS AN OFFICER AND OWNER OF ATLAS MARKETING PARTNERS, INC., ATLAS INVESTMENT VENTURES LLC, AND TEK VENTURES, LLC,

KENAN AZZEH, INDIVIDUALLY AND AS AN OFFICER AND OWNER OF KASM, AND

SANDRA BARNES, INDIVIDUALLY AND AS AN OFFICER AND OWNER OF ACE BUSINESS SOLUTIONS LLC,
                              Defendants.

Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC" or "Commission"), pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), for its Complaint alleges:

1.      Plaintiff brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105, for permanent injunctive relief, monetary relief, civil penalties, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule ("TSR"), as amended, 16 C.F.R. Part 310.

## SUMMARY OF CASE

2.      Defendants Stratics Networks Inc. ("Stratics Networks") and Netlatitude, Inc. ("Netlatitude") provided and implemented technology to initiate outbound robocalls to consumers' phones to illegally telemarket various goods and services, including other Defendants' debt relief services.

3.      These marketing schemes bombarded consumers with tens of millions of "ringless voicemails." A ringless voicemail is a prerecorded message delivered to consumers by calling their phone numbers in a way that typically does not cause their phones to ring.

4.      Several of the Defendants in this case have violated or assisted violations of various provisions of the TSR by placing or facilitating robocalls—including calls delivering ringless voicemails—that use prerecorded messages to induce purchases from consumers who have not agreed receive such messages, that are placed to phone numbers listed on the National Do Not Call Registry, and that fail to promptly and truthfully disclose the sellers' identities. Some of the Defendants have also violated both the TSR and Section 5 of the FTC Act by misrepresenting material aspects of their debt relief

services and have violated the TSR by requesting and receiving consumers' payments for debt relief services before those consumers' debts have been reduced or renegotiated.

5.    To stop and prevent the recurrence of these violations, including the unlawful conduct that clutters consumers' voicemail boxes with unwanted and deceptive marketing pitches, the United States seeks injunctive, monetary, and other relief and civil penalties.

## **JURISDICTION AND VENUE**

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 1355, and 15 U.S.C. § 53(b). This action arises under 15 U.S.C. § 45(a).

7.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (b)(3), (c)(1), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

## **DEFENDANTS**

8.    **Stratics Networks Inc.** ("Stratics Networks") is a Canadian corporation with a registered office address of 762 Upper James Street, Suite 287, Hamilton ON L9C 3A2. Stratics Networks is owned by Josh Justice and is an international provider of mass telecommunication services, which have included ringless voicemail (RVM) platform service, wholesale Session Initiation Protocol (SIP) termination (outbound calling using Voice Over Internet Protocol (VoIP) technology) services, outbound interactive voice response (IVR), voice broadcasting, SMS texting, call center software, and various telephony devices used in the lead generation industry. Stratics Networks, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Stratics Networks has assisted and facilitated the initiation of outbound telephone calls to consumers in this district and throughout the United States to induce them to purchase goods and services.

9.    **Netlatitude, Inc.** ("Netlatitude") is a Texas corporation with a registered office located at 11917 Knippwood Lane in Houston, Texas 77024. Netlatitude is a

telecommunications services company offering, among other things, VoIP services, including ringless voicemail and wholesale SIP termination. Netlatitude, in connection with the matter alleged herein, routes and transmits outbound telephone calls for lead generation telemarketing robocall campaigns related to debt relief services. Also in connection with the matters alleged herein, Netlatitude transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Netlatitude has assisted and facilitated the initiation of outbound telephone calls to induce consumers to purchase debt relief services.

10. **Kurt S. Hannigan** ("Hannigan") is the President of Netlatitude and a resident of Texas. Hannigan established Netlatitude's wholesale SIP termination services account with Stratics Networks and served as its point of contact for billing and account inquiries. Hannigan, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States. Also, at all times relevant to this Complaint, acting alone or in concert with others, Hannigan has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Netlatitude, including the acts or practices set forth in this Complaint. Through his direct participation in, and control over, Netlatitude, Hannigan has had knowledge of the acts and practices constituting the violations alleged herein, had control over them, and directly participated in them.

11. **Tek Ventures, LLC**, also doing business as **Provident Solutions** ("Provident Solutions"), is a California limited liability company with its principal place of business at 1660 Hotel Circle North, Suite 616, San Diego, California 92108. Provident Solutions offers debt relief services to consumers seeking to reduce their credit card debts. Provident Solutions, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

12. **Atlas Marketing Partners, Inc.** ("Atlas Marketing") is a Nevada corporation with its principal place of business at 1660 Hotel Circle North, Suite 620, San

Diego, California 92108. Atlas Marketing is a marketing company principally engaged in lead generation, through outbound telephone calls, including robocalls, to sell debt relief services for Provident Solutions. Atlas Marketing is a seller and telemarketer that initiated outbound telephone calls to induce consumers to purchase Provident Solutions' debt relief services. Atlas Marketing, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

13. **Atlas Investment Ventures, LLC** ("Atlas Investment") is a California limited liability company with its principal place of business at 1660 Hotel Circle North, Suite 620, San Diego, California, 92108. Atlas Investment employed telemarketers that received inbound telephone calls from consumers responding to outbound telephone calls, including robocalls, to induce consumers to purchase Provident Solutions' debt relief services. Atlas Investment, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

14. **Eric Petersen** ("Petersen") is a co-owner of Atlas Marketing, Atlas Investment, and Provident Solutions. He resides in San Diego, California. Through his direct participation in, and control over, Atlas Marketing, Atlas Investment, and Provident Solutions, Petersen has had knowledge of the acts and practices constituting the violations alleged herein, had control over them, and directly participated in them.

15. **Todd DiRoberto** ("DiRoberto") is a co-owner of Atlas Marketing, Atlas Investment, and Provident Solutions. He resides in San Diego, California. Through his direct participation in, and control over, Atlas Marketing, Atlas Investment, and Provident Solutions, DiRoberto has had knowledge of the acts and practices constituting the violations alleged herein, had control over them, and directly participated in them.

16. **Ace Business Solutions LLC** ("Ace") is a Nevada limited liability company with its principal place of business at 1911 Ginori Court, Henderson, Nevada 89014. Ace is a purported subcontractor for Provident Solutions and provides debt relief services, including debt validation letter writing services, and requests, receives, and processes payments from Provident Solutions' customers for debt relief services. Ace, in

6

connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

17.   **Sandra Barnes** ("Barnes") is the owner and director of Ace. Through her direct participation in and control over Ace, Barnes has had knowledge of the acts and practices constituting the violations alleged herein, had control over them, and directly participated in them.

18.   **Kasm, also d/b/a Kasm, Inc.,** ("Kasm") is a California corporation with its principal place of business at 1106 Second Street, Suite 348, Encinitas, California 92024. Kasm conducted marketing and lead generation for debt relief services on behalf of Atlas Investment from 2013 to March 2021. Kasm, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

19.   **Kenan Azzeh** ("Azzeh") is the owner and director of Kasm. He resides in Carlsbad, California. As Kasm's owner and director, Azzeh provided marketing services to Atlas Marketing from early to mid-2013 to March 2021. Through his direct participation in, and control over, the marketing practices of Atlas Marketing, Atlas Investment, and Provident Solutions, Azzeh has had knowledge of the acts and practices constituting the violations alleged herein, had control over them, and directly participated in them.

## COMMON ENTERPRISE

20.   Defendants Atlas Marketing, Atlas Investment, and Provident Solutions (collectively, "Atlas Defendants") have operated as a common enterprise while engaging in the violations of the TSR alleged herein. The Atlas Defendants have conducted the business practices described herein through an interrelated network of companies that have common ownership, officers, business locations, and business functions, and that have engaged in a common scheme to engage in telemarketing to sell debt relief services. Because the Atlas Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. At all times relevant

to this Complaint, Defendants Petersen and DiRoberto have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Atlas Defendants that constitute the common enterprise.

## COMMERCE

21.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE TELEMARKETING SALES RULE AND
## THE NATIONAL DO NOT CALL REGISTRY

22.     In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

23.     Among other things, the 2003 amendments to the TSR established a do not call registry, maintained by the FTC (the "National DNC Registry" or "DNC Registry"), of consumers who do not wish to receive certain types of telemarketing calls. Consumers can register their telephone numbers on the DNC Registry without charge either through a toll-free telephone call or online at donotcall.gov.

24.     Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call or online at donotcall.gov, or by otherwise contacting law enforcement authorities.

25.     The TSR defines "telemarketing" as a plan, program or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. 16 C.F.R. § 310.2(gg).

26.     Under the TSR, a "telemarketer" is any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff).

27.     A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration. 16 C.F.R. § 301.2(dd).

28.     The FTC allows sellers, telemarketers, and other permitted organizations to access the DNC Registry online at telemarketing.donotcall.gov to pay any required fees and to download the numbers not to call.

29.     Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(x).

30.     The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to numbers on the DNC Registry unless the seller (1) has obtained the consumer's express agreement, in writing, to place such calls, or (2) has an established business relationship with that consumer, and the consumer has not stated that he or she does not wish to receive such calls. 16 C.F.R. § 310.4(b)(1)(iii)(B).

31.     As amended, effective September 1, 2009, the TSR prohibits initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller. The express agreement must include the recipient's telephone number and signature, must be obtained after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person, and must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service. 16 C.F.R. § 310.4(b)(1)(v). Calls delivering prerecorded messages are commonly called "robocalls."

9

32.     The TSR requires telemarketers in an outbound telephone call or internal or external upsell to induce the purchase of goods or services to disclose the identity of the seller truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call. 16 C.F.R. § 310.4(d)(1).

33.     The TSR prohibits sellers and telemarketers from making a false or misleading statement to induce any person to pay for goods or services or to induce a charitable contribution. 16 C.F.R. § 310.3(a)(4).

34.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service and the amount of time necessary to achieve the represented results. 16 C.F.R. § 310.3(a)(2)(x).

35.     Under the TSR, a "debt relief service" is any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector. 16 C.F.R. § 310.2(o).

36.     The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for any debt relief service until and unless:

    a. The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

    b.  The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

    c.  To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

  i. Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

  ii. Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt. 16 C.F.R. § 310.4(a)(5)(i).

37. It is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Sections 310.3(a), (c) or (d), or 310.4 of the TSR. 16 C.F.R. § 310.3(b).

38. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## **DEFENDANTS' BUSINESS ACTIVITIES**

### **Stratics Networks' Ringless Voicemail (RVM) Platform Service**

39. Stratics Networks offers its customers the use of its ringless voicemail (RVM) platform service, which uses phone calls to deliver prerecorded voice messages (i.e., robocalls) *en masse* to consumers, ostensibly without causing the recipient's phone to ring and without giving recipients the opportunity to answer or block the incoming prerecorded message.

40.     Stratics Networks, has advertised online that it is the "U.S. Inventor[] of Ringless Voicemail & Unlimited Ringless Voicemail Drops."[1]

41.     Despite Stratics Networks' description of its voicemail technology as "ringless," the delivery of a prerecorded message to cellular telephone subscribers' voicemail box may trigger an audible and visual notification that alerts recipients that they have new voicemails. In fact, Stratics Networks stated in its own terms of service that RVMs "may in some circumstances make a partial ring or line 'tap' or 'ping' on a recipient's phone."

42.     Stratics Networks' RVM platform enables customers to upload prerecorded messages, lists of recipients' cell phone numbers, and caller IDs to transmit along with each prerecorded message.

43.     Stratics Networks has access to the prerecorded messages its customers upload to its RVM platform and reserves the right to audit its customers' accounts in its terms and conditions of service, but it does not conduct due diligence to ensure that the messages actually identified the seller or caller, or to prohibit the transmission of prerecorded messages that failed to do so, or to ensure that that the call recipient had given express consent to receive the call.

44.     Stratics Networks' RVM platform also allowed, but did not require, its customers to scrub lists of uploaded cell phone numbers against the National DNC Registry and state do-not-call lists.

45.     Stratics Networks maintained and/or generated transmission records for its customers. These transmission records include the customer's calling number (caller ID), the recipient's cell phone number, the duration of the call, the date and time of the delivery, and the disposition (i.e., that the prerecorded message reached the consumer's voicemail inbox).

---

[1] *See* https://www.linkedin.com/company/stratics-networks (accessed Jan. 29, 2022).

**Stratics Networks' Wholesale SIP Termination Service**

46.     Stratics Networks' wholesale SIP termination (outbound calling) service routed and transmitted outbound telephone calls, including robocalls, to a recipient's telephone number, and it provided its customers, including upstream voice service providers and/or end-users, with the ability to route and transmit such calls.

47.     Since at least 2013, Stratics Networks resold wholesale SIP termination service to other voice service providers, including Defendant Netlatitude and other providers that have delivered unlawful robocalls.

48.     Stratics Networks claims to have terminated its provision of wholesale SIP termination service in December 2020.

**Stratics Networks' RVM Customers Operated Robocall Campaigns in Violation of the TSR**

49.     Many of Stratics Networks' RVM customers, including but not limited to the Atlas Defendants, (who are discussed in further detail at Paragraphs 59 through 84 below) are "sellers" and/or "telemarketers" and were engaged in "telemarketing" as those terms are defined in the TSR, 16 C.F.R. § 310.2.

50.     Stratics Networks' RVM customers include sellers and/or telemarketers that initiated or caused others to initiate outbound telephone calls delivering a prerecorded message to consumers to induce the purchase of goods or services.

51.     Stratics Networks' RVM customers have engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of goods and services by the use of one or more telephones and which involves more than one interstate telephone call.

52.     At all times relevant to this Complaint, Stratics Networks' RVM customers have maintained a substantial course of trade or business in the offering for sale of goods or services via the telephone, in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

53.     Stratics Networks and its RVM customers are responsible for bombarding American consumers in this district and throughout the United States with millions of illegal robocalls, all delivered utilizing Stratics Networks' RVM platform service.

54.     These illegal robocalls pitched a variety of consumer goods and services, including homebuying services, credit card and student debt relief services, and health insurance. Stratics Networks' RVM customers also utilized Stratics Networks' RVM platform service to deliver robocalls to consumers associated with fake lawsuit scams, fraudulent sweepstakes, or cable television discount offers.

55.     In numerous instances, when these outbound telephone calls delivered prerecorded messages offering goods or services, Stratics Networks' RVM customers did not have a signed, express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of the seller whose goods or services were being offered. Stratics Networks' RVM customers nevertheless initiated these robocalls to consumers residing in this district and throughout the United States.

56.     Despite acknowledging in its terms and conditions of service that its customers must "obtain the prior written consent from each recipient to contact such recipient" "[w]here required by applicable law or regulation," Stratics Networks did not have evidence of such consent and did not request or require that its customers submit such evidence.

57.     In the course of the telemarketing robocall campaigns described above, Stratics Networks' RVM customers also initiated or caused the initiation of millions of outbound telephone calls to numbers that had been on the DNC Registry for more than 31 days. In numerous instances, Stratics Networks and its RVM customers did not scrub the lists of uploaded recipient phone numbers against the DNC Registry, or make sure they were scrubbed before they were uploaded onto the RVM platform. In numerous instances, at the time of these calls, Stratics Networks' RVM customers also did not have a written agreement from consumers on the DNC Registry to receive such calls; nor did

they have a pre-existing or established business relationship with them. Stratics Networks and its RVM customers nevertheless initiated these calls to consumers residing in this district and throughout the United States.

58.    In the course of the telemarketing robocall campaigns described above, in numerous, if not all, instances, Stratics Networks' RVM customers failed to disclose to consumers, truthfully, promptly, and in a clear and conspicuous manner, the identity of the seller of the goods or services.

### The Atlas Defendants' Telemarketing Campaign Violated the TSR

#### *The Atlas Defendants' Ringless Voicemail Operation*

59.    Among the robocalls delivered via Stratics Networks' RVM platform were millions of calls marketing the Atlas Defendants' debt relief services.

60.    The Atlas Defendants are "sellers" and "telemarketers" of "debt relief services" and engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

61.    The Atlas Defendants are sellers and telemarketers that initiated or caused the initiation of outbound telephone calls, including calls delivering prerecorded messages to consumers in the United States to induce the purchase of credit card debt relief services, and that received inbound calls from consumers.

62.    The Atlas Defendants have engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of credit card debt relief services by the use of one or more telephones and which involves more than one interstate telephone call.

63.    Since at least January 2019, the Atlas Defendants have maintained a substantial course of trade or business in the offering for sale of goods or services via the telephone, in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

64.    In 2013, the Atlas Defendants hired Azzeh, doing business under his own company—Kasm—to provide marketing services. Azzeh conducted lead generation for the Atlas Defendants, including by managing direct mail campaigns, purchasing live transfers, and delivering ringless voicemails. Azzeh continued to work for the Atlas

Defendants until April 30, 2021. During this time, Azzeh and Kasm were "telemarketers" on behalf of the Atlas Defendants and initiated millions of outbound telephone calls delivering prerecorded messages to consumers to induce the purchase of the Atlas Defendants' debt relief services.

65.    Between at least September 2019, and November 2020, Azzeh purchased access to Stratics Networks' RVM platform service to place lead generation robocalls pitching the Atlas Defendants' credit card debt relief services.

66.    Many of the Atlas Defendants' robocalls represented to consumers that they are following up on a previous "offer" or "notice" for a plan to "resolve [the consumer's] credit card debt in 24 months with affordable repayment options."  For example, consumers received the following robocall, or a substantially similar version, which Azzeh delivered on behalf of the Atlas Defendants using Stratics Networks' RVM platform service:

> Hi, this is Sara. I'm following up on an offer we sent regarding your eligibility for our new 2020 debt relief program. This program has affordable repayment options and, in most cases, can have you out of credit card debt in 24 months or less. You can reach me at 855-914-2203. Again that's 855-914-2203.

67.    The outbound calls delivering prerecorded messages to induce the purchase of debt relief services include more than 23 million such calls that Atlas Marketing initiated or caused the initiation of using Stratics Networks' RVM platform service between August 17 and November 20, 2020.

68.    Azzeh, Petersen, and an Atlas Investment employee drafted scripts for the Atlas Defendants' prerecorded messages. Azzeh's wife, Krista Azzeh, recorded the messages. Azzeh then uploaded audio files of the prerecorded messages and lists of consumers' cellular telephone numbers onto Stratics Networks' RVM platform.

69.    In numerous, if not all, instances, at the time these outbound telephone calls delivered prerecorded messages offering debt relief services, the Atlas Defendants did not have a signed, express agreement, in writing, that evidenced the willingness of the

16

recipient of the call to receive calls that deliver prerecorded messages by or on behalf of the Atlas Defendants. The Atlas Defendants did not obtain prior express written consent from consumers to deliver prerecorded messages to them. Nonetheless, Azzeh used Stratics Networks' RVM platform, on behalf of the Atlas Defendants, to deliver prerecorded messages to consumers residing in this district and throughout the United States.

70.    In addition, the Atlas Defendants' prerecorded messages failed to disclose to consumers, truthfully, promptly, and in a clear and conspicuous manner, the identity of the seller of the debt relief service.

*The Atlas Defendants' Debt Relief Services Program*

71.    In numerous instances, consumers that called back the Atlas Defendants after receiving a ringless voicemail were connected to live telemarketers, employed by Atlas Investment, who once again failed to disclose to consumers, truthfully, promptly, and in a clear and conspicuous manner, the identity of the seller of the debt relief service. Instead, Atlas Investment's live telemarketers routinely identified themselves as representatives of "Consumer Services."

72.    Atlas Investment's telemarketers used the name "Consumer Services" as a buffer to avoid revealing and tainting the actual business.

73.    Consumers who signed up for the Atlas Defendants' debt relief service were told the company's name was "Provident Solutions."

74.    Atlas Investment's live telemarketers typically interviewed interested consumers about their credit card debt to determine how much they could afford to pay for debt relief services each month, and then transferred interested consumers to more senior agents to register consumers for the debt relief program. Atlas Investment's live telemarketers also instructed consumers to provide their personal information, such as bank account and routing numbers, so that Atlas Defendants could collect payment from consumers for the debt relief service.

75.    In numerous instances, consumers were subsequently transferred (or called at a later time) for quality control calls, wherein another live telemarketer verified the consumer's banking information, payment amount, and draft date. The quality control calls were conducted by Ace employees.

76.    In numerous instances, Atlas Investment's live telemarketers represented to consumers that some of their monthly payment would be used to pay the consumer's debts.

77.    During the quality control calls, however, Ace typically asked consumers to affirm that they understood the monthly payments were for the Atlas Defendants' fees only. In numerous instances, the discrepancy between the representations made during the sales pitch and quality control calls led to consumer confusion.

78.    The Atlas Defendants purportedly subcontracted the debt relief service program to Barnes and her company, Ace. Barnes and Ace were "sellers" that, in connection with the Atlas Defendants' telemarketing, provided debt validation letter writing services to consumers in exchange for consideration. Barnes and Ace were also "telemarketers" that, in connection with telemarketing, initiated or received telephone calls to or from customers.

79.    The Atlas Defendants' debt relief services, carried out by Ace, consisted of a series of debt validation letters sent by Ace to consumers' creditors challenging the validity of the consumers' debt, regardless of whether the consumers believed the debt was, in fact, invalid.

80.    In numerous instances, Ace requested and received monthly bank withdrawals from consumers approximately 30 days after the consumers enrolled in the Atlas Defendants' debt relief services program, regardless of whether Ace had sent a debt validation letter for the consumers at that time. Frequently, no debt validation letter had been sent at that time. After Ace received consumers' payments, it distributed a percentage of the fees back to the Atlas Defendants.

81. Thus, in numerous instances, Ace and the Atlas Defendants received fees they caused to be drawn from consumers' bank accounts within 30 days of their enrollment in the debt relief program, but before Ace had undertaken any efforts to renegotiate, settle, reduce, or otherwise alter the terms of at least one debt pursuant to a settlement agreement, debt management plan, or any other valid contractual agreement executed by the customer. In numerous instances, Ace and the Atlas Defendants continued to receive monthly fees from consumers for many months despite never renegotiating, settling, reducing, or otherwise altering the terms of the consumer's debt.

82. In numerous instances, the Atlas Defendants charged consumers between $6,000 and $8,000 for multiple debt validation letters over 36 to 48 months, despite the representations in Atlas Marketing's ringless voicemail messages that "in most cases" its debt relief program "can have [consumers] out of credit card debt in 24 months or less." The Atlas Defendants knew from experience that most consumers would not be out of credit card debt within 24 months or less, and Petersen has admitted as much in an FTC investigational hearing.

83. Most of the Atlas Defendants' customers did not complete the program, and many filed for bankruptcy.

84. The Atlas Defendants, Petersen, DiRoberto, Ace, and Barnes have received or reviewed consumer complaints and correspondence that allege violations of federal telemarketing regulations and that consumers have been misled by telemarketers' representations. The Atlas Defendants, Petersen, DiRoberto, Ace, and Barnes knew or had knowledge fairly implied on the basis of objective circumstances that their activities were covered by the TSR and violated it, as demonstrated by, among other things, their receipt of such complaints; their engagement of and interactions with telemarketing compliance legal counsel; DiRoberto's involvement in prior TSR enforcement litigation, including *United States v. Dish Network, LLC*, No. 09-3073 (C.D. Ill.); and Petersen's FTC investigational hearing testimony concerning these defendants' debt relief services, billing practices, and representations to consumers.

19

**Stratics Networks Knew or Consciously Avoided Knowing it Was Assisting and Facilitating its RVM Customers' TSR Violations**

85.     Stratics Networks has provided substantial assistance or support to "telemarketer[s]" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

86.     Stratics Networks provided substantial assistance and support to its RVM customers, including Atlas Marketing, by, among other things, providing them with the means to initiate outbound telephone calls that deliver a prerecorded message to induce the purchase of goods or services in this district and throughout the United States via its RVM platform service.

87.     By July 2017, if not earlier, Stratics was aware of the FTC's enforcement of the TSR, particularly with respect to ringless voicemails, and thus knew or should have known that between 2018 and 2020, the FTC filed and publicized a case against, settlement with, and court judgment against defendants that violated the TSR through illegal robocall campaigns that delivered ringless voicemails. Stratics Networks thus had knowledge or knowledge fairly implied that ringless voicemails are covered by the TSR.

88.     Stratics Networks had direct knowledge of, and the right to control, the robocalls alleged herein that utilized its RVM service, as the prerecorded messages are delivered only after audio files of the prerecorded messages are uploaded and stored on Stratics Networks' RVM platform. Further, Stratics Networks permitted and enabled its RVM customers, including Atlas Marketing, to deliver millions of prerecorded messages without requiring and ensuring that they obtain prior express written consent from recipients, scrub lists of uploaded phone numbers against the DNC Registry, or otherwise comply with the TSR.

89.     Stratics Networks created transmission records of the prerecorded messages delivered via its RVM platform, which included, among other things, the recipients' phone numbers, call duration, date and time.

90.     Since at least September 2019, Stratics Networks knew or consciously avoided knowing that its RVM customers were violating the TSR in their telemarketing

robocall campaigns to induce the purchase of goods or services. Stratics Networks knew or consciously avoiding knowing that, among other things, its RVM customers initiated outbound telephone calls:

    a. that delivered prerecorded messages offering goods or services, without having a signed, express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of the seller whose goods or services were being offered;

    b. to numbers listed on the National DNC Registry to induce the purchase of goods or services, without having a written agreement from consumers to receive such calls or a pre-existing or established business relationship with them;

    c. that failed to disclose the identity of the seller of goods or services truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call.

*Traceback Requests Regarding RVM Customers' Robocall Campaigns*

91.    USTelecom's Industry Traceback Group (ITG), the official U.S. Federal Communications Commission (FCC)-designated consortium of telephone and broadband industry companies working to determine the sources of and stop illegal robocalls, repeatedly alerted Stratics Networks to likely illegal robocalls delivered using its RVM platform.

92.    USTelecom's ITG sends emails to voice service providers seeking assistance with identifying the source of suspicious traffic, and it refers to these emails as "Traceback Requests."

93.    USTelecom's ITG defines a "Traceback" as follows:

A network-based process that seeks out the source of Suspicious Traffic. Beginning at a terminating Voice Service Provider, a call is systematically traced from one Voice Service Provider to the preceding Voice Service

21

Provider networks until a Non-Cooperative Voice Service Provider and/or the originating Voice Service Provider or originating customer is identified.

94.    USTelecom's ITG identifies as "Suspicious Traffic" "a pattern of voice calls that: (1) transit one or more Voice Service Provider networks and (2) have characteristics associated with abusive, unlawful, or fraudulent practices (including, but not limited to, lack of header information, volumetric anomalies, calling or called party information modification, complaints received from called parties, law enforcement, third-party aggregators, or call transcripts)."

95.    Stratics Networks received numerous Traceback Requests from USTelecom's ITG alerting it to suspected illegal robocall traffic delivered via Stratics Networks' RVM platform service and seeking its assistance in identifying the source(s) (i.e., upstream carrier or originating end-user) of these "likely illegal" robocalls, including over 30 such requests between August 2019 and February 2021.

96.    These Traceback Requests to Stratics Networks identified likely illegal robocalls that were being conducted through Stratics Networks' RVM platform in connection with telemarketing campaigns that related to a variety of topics, including homebuying services, credit card and student debt relief services, health insurance, cable television discounts, fake lawsuit scams, and fraudulent sweepstakes winner notifications.

97.    The Traceback Requests to Stratics Networks concerned robocall telemarketing campaigns conducted over Stratics Networks' RVM platform by several of its RVM customers, including Atlas Marketing, Telecord, Telesero, Health Innovations, National Homebuyers, Elite Processing, Deltracon, Technest Limited, Shamoon Ahmad, Progressive Promoting, Nitzke Enterprize, Care Advocacy Solutions, and PubClub.

98.    USTelecom's ITG Traceback Requests to Stratics Networks provided call detail records (i.e., the date, time, and called from and called to numbers) for suspicious robocall incidents, and they also included additional details describing the characteristics of the prerecorded messages associated with abusive, unlawful, or fraudulent practices, including notes in some of the Traceback Requests that the calls had prerecorded

22

messages, did not identify the calling party, were placed to numbers on the National Do Not Call Registry, were "likely FRAUD," or involved attempts to extort money from consumers.

99.     USTelecom's ITG Traceback Requests gave Stratics Networks access to audio recordings of the prerecorded messages at issue to assist it in identifying the robocalls' source. Stratics Networks also had access to the prerecorded audio messages its customers uploaded to its RVM platform, which it had the right to audit pursuant to its terms and conditions of service. The audio recordings demonstrated that prerecorded messages delivered via Stratics Networks' RVM platform failed to disclose to consumers, truthfully, promptly, and in a clear and conspicuous manner, the identity of the seller of goods or services.

100.     Despite USTelecom's requests that Stratics Networks provide the identity of the end-user responsible for the suspected illegal robocalls identified in the Traceback Requests, in several instances, Stratics Networks failed to do so.

101.     In some instances, even when Stratics Networks did identify the RVM customers responsible for these illegal robocalls, Stratics Networks allowed these RVM customers to open additional accounts and/or continue utilizing its RVM platform service for several weeks or months without suspending or terminating their RVM accounts.

102.     In some instances, Stratics Networks did not suspend these RVM customers' accounts until after it received a civil investigative demand from the FTC in November 2020 inquiring about prerecorded messages delivered using its RVM platform service.

103.     Notwithstanding the foregoing Traceback Requests, Stratics Networks continued to permit its RVM customers to utilize its RVM platform service to deliver prerecorded messages offering goods and services without requiring and verifying that any of the RVM customers had obtained prior express written consent from recipients or that the prerecorded messages disclose the identity of the seller of goods or services. Stratics Networks also continued to allow its RVM customers to turn off features in the

RVM platform that could prevent the delivery of prerecorded messages to numbers on the DNC Registry.

104.    Several of US Telecom's ITG's Traceback Requests to Stratics Networks concerned robocalls delivered over Stratics Networks' RVM platform as part of the Atlas Defendants' debt relief telemarketing campaign, including Traceback Requests Stratics Networks received between April and June 2020. These Traceback Requests indicated that they concerned a "DebtReduction-Hardship" or "DebtReduction-CoronaHardship" campaign, and they noted that the robocalls delivered prerecorded messages offering pre-approved loans and did not identify the caller.

105.    Notwithstanding Stratics Networks' representation to US Telecom's ITG in response to a April 29, 2020 traceback request that it "ha[d] taken immediate action and triggered a full investigation" into the Traceback Request and "also suspended traffic," Stratics Networks permitted Atlas Marketing to continue using its RVM platform service to deliver millions more robocalls for over five more months.

106.    Accordingly, by no later than on or about April 29, 2020, Stratics Networks knew or consciously avoided knowing that Atlas Marketing utilized its RVM platform service to deliver prerecorded messages offering debt relief services without requiring it to obtain prior express written consent from recipients or disclose the identity of the seller of the debt relief services.

107.    After April 29, 2020, Stratics Networks permitted Atlas Marketing to use its RVM service to deliver more than 23 million additional ringless voicemail robocalls to American consumers.

108.    On October 26, 2020, the FTC issued a CID to The Stratics Group, Inc. d/b/a/ Stratics Networks Inc. requesting, *inter alia*, information concerning certain wholesale SIP termination and RVM customers that had originated, initiated, or routed telephone calls using Stratics Networks' services. The CID stated that the purpose of its investigation was to determine, among other things, whether persons or entities initiated,

caused the initiation of, or assisted the initiation of outbound telephone calls that violated the TSR. Stratics Networks acknowledged the CID on November 5, 2020.

109.    As described above, even after Stratics Networks acknowledged the FTC's CID, it continued to provide RVM platform service to telemarketers that placed outbound telephone calls that delivered prerecorded messages (i.e., robocalls) to induce the purchase of goods or services in violation of the TSR.

## Netlatitude's Customers Operated Telemarketing Campaigns in Violation of the TSR

110.    Between at least June 2015 and September 2020, Netlatitude purchased access to Stratics Networks' wholesale SIP termination (outbound calling) service to route and transmit robocalls, including lead-generation robocalls pitching debt relief services and COVID-19 pandemic-related rebate and cash incentive programs.

111.    Netlatitude also routed and transmitted lead generation robocalls utilizing SIP termination (outbound calling) service not provided by Stratics Networks. For example, in April 2020, Netlatitude routed such calls using SIP termination service from Alcazar Networks, Inc., a nationwide provider of interconnected VoIP services that the FTC later sued for assisting and facilitating tens of millions of illegal telemarketing robocalls. *See FTC v. Alcazar Networks, et al.*, No. 6:20-cv-02200 (M.D. Fla. filed Dec. 3, 2020).

112.    Many of these outbound telephone calls that Netlatitude routed and transmitted between January 2020 and April 2021 were on behalf of its customer Fortress Leads S De Rl De Cv ("Fortress Leads"), which operated lead generation ringless voicemail robocall campaigns originating outside of the United States. Netlatitude served as the U.S. Point of Entry (i.e., first voice service provider within a call's path to transmit an illegal robocall from a foreign voice service provider and place the call on the U.S. public switched telephone network) for these robocall campaigns.

113.    Netlatitude's customers, including Fortress Leads, were "telemarketers" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

114.   Many of the ringless voicemail robocalls routed and transmitted by Netlatitude through Stratics Networks' SIP termination network told consumers that they were qualified or pre-approved for programs that would lower or eliminate their loan payments or balances. For example, on April 9, 2020, Netlatitude routed and transmitted a telemarketing robocall via Stratics Networks' SIP termination network that stated the following:

> Hey, it's Kyla with processing. I was just calling to let you know that we do have your pre-approved amount for the hardship program. Um…it is up to $55,000, so just give me a call and we can go over the details. My number is 877-224-0244…and you can speak to me or any one of the representatives. Just in the case, the number again is 877-224-0244. I look forward to hearing from you and have a great day.

115.   Many calls that Netlatitude routed and transmitted, including through Stratics Networks' SIP termination network, delivered unlawful prerecorded messages to induce the purchase of goods or services and failed to disclose the identity of the seller, in violation of the TSR. This was true, for example,  of most, if not all, of more than 136,000 robocalls Netlatitude routed and transmitted to consumers using Stratics Networks' SIP termination service on just two days in September 2020.

116.   Many of the calls that Netlatitude routed, and transmitted, including through Stratics Networks' SIP termination network, were placed to numbers that had been listed on the National Do Not Call Registry for more than 31 days, in violation of the TSR. This was true of many of the more than 136,000 robocalls Netlatitude routed and transmitted to consumers using Stratics Networks' SIP termination service on just two days in September 2020.

**Stratics Networks and Netlatitude Knew or Consciously Avoided Knowing They Were Assisting and Facilitating Netlatitude's Customers' TSR Violations**

117.   On April 13, 2020, USTelecom's ITG sent Stratics Networks a Traceback Request seeking its assistance in identifying the sources of certain suspected illegal robocalls routed through Stratics Networks that the request described as prerecorded

messages offering pre-approved loans that did not identify the caller and that were placed to numbers on the National Do Not Call Registry.

118.   In response, Stratics Networks informed US Telecom's ITG on April 16, 2020, that the calls at issue in the traceback request originated from Netlatitude, and that Kurt Hannigan was responsible for them.

119.   Stratics Networks nevertheless continued providing its SIP termination service to Netlatitude and enabling Netlatitude to continue routing its customers' illegal robocalls for several additional months, until September 2020.

120.   From April 2020 through September 3, 2020, Stratics Networks received eight Traceback Requests concerning suspected illegal robocall traffic it received from Netlatitude. Over this time period, Stratics Networks repeatedly identified Netlatitude as the source of these calls, but it refused to take appropriate steps to eliminate the illegal robocall traffic it received from Netlatitude. Stratics Networks thus knew or consciously avoided knowing that Netlatitude was using Stratics Networks' service to transmit illegal robocalls.

121.   USTelecom's ITG also sent Netlatitude more than a dozen Traceback Requests regarding its suspicious traffic, including requests sent between April and July 2020. In each Traceback Request notification email, the ITG included call details for each incident and a description of the associated campaign.

122.   In response to a Traceback Request sent on May 2, 2020, Hannigan identified the customer as foreign telemarketer Fortress Leads. On May 5, 2020, USTelecom's ITG responded to Hannigan and asked him and his customer to review and comply with applicable US regulations, including general prohibitions and restrictions on calls to wireless numbers using a prerecorded voice and requirements that voicemails must identify the entity responsible for the call.

123.   On or before May 5, 2020, Netlatitude knew or consciously avoided knowing that it was routing and transmitting illegal robocall traffic. Despite receiving more than a dozen Traceback Requests from USTelecom's ITG, Netlatitude refused to

take appropriate steps to cease transmitting this traffic. It continued to route and transmit numerous robocalls delivering unlawful prerecorded messages without obtaining consumers' prior consent, which failed to identify the seller and which were sent even to numbers that were listed on the National Do Not Call Registry.

124.   Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission, and that consumers will continue to be injured by those ongoing violations, because, among other things, Defendants: (a) have shown a pattern and practice of continuing to assist and facilitate violations of the TSR, even after learning of the violations; (b) remain active in the telecommunications or debt relief services industries and maintain the means, ability, and incentive to resume their unlawful conduct; (c) have repeatedly ignored law enforcement agencies' and trade associations warnings about suspected illegal robocall traffic routed across their networks; (d) have suspended customers violating telemarketing laws only after repeated warnings from law enforcement agencies or trade associations; and/or (e) have failed to fully respond to CIDs issued by the Commission.

## VIOLATIONS OF THE FTC ACT

125.   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

126.   Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I (The Atlas Defendants, Petersen, DiRoberto, Kasm, Azzeh)
### Misrepresentations Regarding Debt Relief Service

127.   Paragraphs 1 through 126 are incorporated as if set forth fully herein.

128.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of a debt relief service, the Atlas Defendants and Defendants Petersen, DiRoberto, Kasm, and Azzeh have represented, directly or indirectly, expressly or by implication, that:

28

a. Consumers who purchase their debt relief service can be out of credit card debt in 24 months or less; and/or

b. Consumers' monthly payments for debt relief service would be applied toward consumer's debt.

129. In truth and in fact, in numerous instances in which the Atlas Defendants and Defendants Petersen, DiRoberto, Kasm, and Azzeh have made those representations:

a. Consumers who purchase their debt relief service are not out of credit card debt in 24 months or less; and/or

b. Consumers' monthly payments for debt relief service were not applied toward consumers debt.

130. Therefore, the representations of the Atlas Defendants and Defendants Petersen, DiRoberto, Kasm, and Azzeh are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II (Stratics Networks, Netlatitude & Hannigan)

### Assisting and Facilitating Violations of the Telemarketing Sales Rule

131. Paragraphs 1 through 126 are incorporated as if set forth fully herein.

132. As set forth above, Defendants Stratics Networks, Netlatitude, and Hannigan have, in numerous instances, provided substantial assistance and support, by providing RVM platform and/or wholesale SIP termination service to one or more "sellers" and/or "telemarketers" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2, that Stratics Networks, Netlatitude, and Hannigan knew, or consciously avoided knowing:

a. Initiated or caused the initiation of outbound telephone calls that delivered prerecorded messages to induce the purchase of goods or services, in violation of 16 C.F.R. § 310.4(b)(1)(v);

b. Initiated or caused the initiation of outbound telephone calls to telephone numbers on the National DNC Registry to induce the purchase of goods or services, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B);

29

c.  Failed to disclose the identity of the seller of the goods or services truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, in violation of 16 C.F.R. § 310.4(d)(1); and

133.  Stratics Networks, Netlatitude, and Hannigan's substantial assistance violates the TSR, 16 C.F.R. § 310.3(b).

## Count III (Atlas Defendants, Petersen, DiRoberto, Kasm & Azzeh)

### Initiating Unlawful Prerecorded Messages

134.  Paragraphs 1 through 126 are incorporated as if set forth fully herein.

135.  As set forth above, in numerous instances, in connection with telemarketing, Atlas Defendants, Petersen, DiRoberto, Kasm, and Azzeh have engaged in initiating or causing the initiation of outbound telephone calls that deliver prerecorded messages to induce the sale of debt relief services.

136.  The acts or practices of Atlas Defendants, Petersen, DiRoberto, Kasm, and Azzeh are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(b)(1)(v)(A).

## Count IV (Atlas Defendants, Petersen, DiRoberto, Kasm & Azzeh)

### Failure to Make Oral Disclosure Required by the TSR

137.  Paragraphs 1 through 126 are incorporated as if set forth fully herein.

138.  As set forth above, in numerous instances since at least September 12, 2019, in connection with telemarketing, Atlas Defendants, Petersen, DiRoberto, Kasm, and Azzeh have engaged in initiating or causing the initiation of outbound telephone calls that failed to disclose the identity of the seller of the debt relief services truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call.

139.  The acts or practices of Atlas Defendants, Petersen, DiRoberto, Kasm, and Azzeh are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(d)(1).

### Count V (Atlas Defendants, Petersen, DiRoberto, Kasm & Azzeh)

### Misrepresentations of Material Aspects of a Debt Relief Service

140.   Paragraphs 1 through 126 are incorporated as if set forth fully herein.

141.   As set forth above, in numerous instances since September 12, 2019, in connection with the telemarketing of a debt relief service, Atlas Defendants, Petersen, DiRoberto, Kasm and Azzeh have misrepresented, directly or indirectly, expressly or by implication, material aspects of their debt relief service, including that:

      a.   Consumers who purchase their debt relief service can be out of credit card debt in 24 months or less; and/or

      b.   Consumers' monthly payments for debt relief service would be applied toward consumer's debt.

142.   The acts or practices of Atlas Defendants, Petersen, DiRoberto, Kasm, and Azzeh are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(x).

### Count VI (Atlas Defendants, Petersen, DiRoberto, Ace & Barnes)

### Charging or Receiving a Fee in Advance of Providing a Debt Relief Service

143.   Paragraphs 1 through 126 are incorporated as if set forth fully herein.

144.   As set forth above, in numerous instances since September 12, 2019, in connection with the telemarketing of a debt relief service, Atlas Defendants, Petersen, DiRoberto, Ace, and Barnes have requested or received payment of a fee or consideration for a debt relief service before: (a) they have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the consumer; and (b) the consumer has made at least one payment pursuant to that agreement.

145.   The acts or practices of Atlas Defendants, Petersen, DiRoberto, Ace, and Barnes, as set forth above, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(5)(i).

**CONSUMER INJURY**

146.   Consumers have suffered and will suffer substantial injury as a result of Defendants' violations of the TSR and the FTC Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

147.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other ancillary relief to prevent and remedy any violation of any provision of law enforced by the FTC.

148.   Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the Federal Civil Penalties Inflation Adjustment Act of 2015, Public Law 114-74, sec. 701, 129 Stat. 599 (2015), and Section 1.98(d) of the FTC's Rule of Practice, 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of not more than $46,517 for each violation of the TSR assessed after January 10, 2022, including penalties whose associated violation predated January 10, 2022, that is made with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule.

149.   Defendants' violations of the TSR described above were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

A.     Enter a permanent injunction to prevent future violations of the TSR and the FTC Act by Defendants;

B.     Award monetary and other relief within the Court's power to grant;

C.     Award Plaintiff monetary civil penalties for every violation of the Telemarketing Sales Rule; and

D.     Award Plaintiff such other and additional relief the Court may determine to be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: February 16, 2023          Respectfully submitted,

| | |
|---|---|
| **FOR FEDERAL TRADE COMMISSION:** | **FOR PLAINTIFF THE UNITED STATES OF AMERICA:** |

Christopher E. Brown
Suzanne Barth
Attorneys
Federal Trade Commission
Washington, DC 20580
(202) 326-2825 (Brown)
(202) 701-6600 (Barth)
(202) 326-3395 (fax)
cbrown3@ftc.gov
sbarth@ftc.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director, Consumer Protection Branch

LISA K. HSIAO
Assistant Director

DANIEL K. CRANE-HIRSCH
Senior Trial Attorney

/s Matthew A. Robinson
MATTHEW A. ROBINSON
ZACHARY A. DIETERT
Trial Attorneys

Civil Division, U.S. Department of Justice
450 5th Street, NW, Suite 6400-South
Washington, DC 20044-0386
Tel.:   (202) 305-4342 (Robinson)
         (202) 616-9027 (Dietert)
         (202) 646-8242 (Crane-Hirsch)
Fax:   (202) 514-8742
Email: Matthew.A.Robinson@usdoj.gov
         Zachary.A.Dietert@usdoj.gov
         Daniel.Crane-Hirsch@usdoj.gov