1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>    v.<br><br>STRATICS NETWORKS INC., *et al.*,<br><br>                              Defendants. | Case No. 23-cv-0313-BAS-KSC<br><br>**TENTATIVE ORDER:**<br><br>**(1) GRANTING DEFENDANT STRATICS NETWORKS INC.'S MOTION TO DISMISS (ECF No. 50-1);**<br><br>**(2) DENYING DEFENDANT ATLAS MARKETING PARTNERS, INC.'S MOTION TO DISMISS AND MOTION TO STRIKE (ECF No. 45-1);**<br><br>**AND**<br><br>**(3) DENYING DEFENDANT ACE BUSINESS SOLUTIONS LLC'S MOTION TO DISMISS (ECF No. 42-1)** |

Pending before the Court are Defendants' Motions brought pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss this action.  (ECF Nos. 42-1, 45-1, 50-1.)  Plaintiff opposes (ECF No. 55) and Defendants reply (ECF Nos. 61, 62, 63).  The Court held argument on March 5, 2024.  (ECF No. 70.)  Having considered the parties' filings and oral arguments, the Court **GRANTS** Defendant Stratics Networks Inc.'s Motion to Dismiss

23cv0313

(ECF No. 50-1), **DENIES** Defendant Atlas Marketing Partners, Inc's Motion to Dismiss and Motion to Strike (ECF No. 45-1), and **DENIES** Defendant Ace Business Solutions LLC's Motion to Dismiss (ECF No. 42-1).

## I.   Background

The Federal Trade Commission ("FTC") is an independent agency of the United States government.  It is charged with enforcement of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair or deceptive acts or practices in or affecting commerce."  The FTC is also responsible for enforcement of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6102. Using its authority under the Telemarketing Act, the FTC promulged the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310, which prohibits deceptive or abusive telemarketing practices.  A violation of the TSR constitutes a violation of the FTC Act.  15 U.S.C. §§ 57a, 6102(c).  The United States, upon notification and authorization under 15 U.S.C. § 56(a)(1), brings suit on behalf of the FTC.

Defendant Stratics Networks Inc. ("Stratics") is a mass telecommunication services corporation offering ringless voicemail and voice over internet protocol ("VoIP") services. (Compl. at ¶ 8.)  Ringless voicemail is a service where users can mass deliver prerecorded messages directly to recipients' voicemail inboxes without causing their phones to ring or giving recipients the opportunity to answer or block the call.  (Compl. at ¶ 39.)  In some instances, however, recipients may get an audible and visual notification that they received a new voicemail, and ringless voicemail may sometimes trigger a "partial ring" of a recipient's phone.  (Compl. at ¶ 41.)  Stratics offers these services to telemarketers and sellers.  (Compl. at ¶ 49.)

Defendant Atlas Marketing ("Atlas"), a Nevada lead generation company, is one such Stratics customer.  (*Id.*)  Defendants Eric Petersen and Todd DiRoberto are the co-owners of Atlas Marketing and its related companies Atlas Investment and Provident Solutions. (Compl. at ¶¶ 14–15.)  Atlas allegedly used Stratics's ringless voicemail service

to pitch debt relief services to consumers between September 2019 and November 2020. (Compl. at ¶ 65.) As part of its pitch, Atlas represented to consumers that it could "resolve [the consumer's] credit card debt in 24 months with affordable repayment options." (Compl. at ¶ 66.) Stratics delivered more than 23 million of Atlas's pitches between August and November 2020. (Compl. at ¶ 67.) If consumers who received these messages called Atlas back, they were connected to Atlas's live telemarketers who sold its debt services. (Compl. at ¶ 71.)

Frequently, consumers were then transferred to or later called back by Defendant Ace Business Solutions LLC ("Ace"). (Compl. at ¶ 75.) Defendant Sarah Barnes is the owner and director of Ace. Ace would verify the consumer's banking information, payment amount, and the payment dates. (*Id.*) Ace would also affirm consumers understood the monthly payments were to be used for Atlas's fees only. (Compl. at ¶ 76.) At times, this led to consumer confusion and customers were referred back to Atlas's telemarketers. (*Id.*) Once customers bought in, Ace would engage in "debt validation" on behalf of Atlas. Ace would draft and send letters to consumers' creditors asking to confirm the validity of the consumers' debts, regardless of whether the consumers believed the debt was invalid. (Compl. at ¶ 79.)

Plaintiff alleges Defendants' telemarketing and debt validation scheme violated the TSR and the FTC Act. In particular, with respect to Atlas, DiRoberto, and Petersen, Plaintiff first alleges they misrepresented a debt relief service, in violation of the TSR and Section 5 of the FTC Act. Specifically, Plaintiff claims Atlas, DiRoberto, and Petersen represented to consumers they would be out of credit card debt within 24 months when they were not and these Defendants did not apply consumers' monthly payments toward consumer debts ("Count I"; "Count V"). Second, Plaintiff alleges Atlas, Petersen, and DiRoberto initiated outbound telephone calls that delivered prerecorded sales messages in violation of the TSR ("Count III"). Third, Plaintiff alleges Atlas, Petersen, and DiRoberto failed to truthfully and promptly disclose the seller's identity in their outbound telephone calls in violation of the TSR ("Count IV"). Fourth, Plaintiff alleges Atlas, Petersen, and

DiRoberto requested or received a fee for a debt relief service before renegotiating, settling, or reducing the terms of a consumer's debt in violation of the TSR ("Count VI").

Plaintiff alleges Ace and Barnes received a fee or consideration for a debt relief service without first renegotiating, settling, or otherwise altering the terms of a consumer's debt and the consumer having made at least one payment pursuant to that agreement ("Count VI").

Plaintiff alleges Stratics provided substantial assistance to a seller or telemarketer in violation of the TSR by knowingly furnishing ringless voicemail services that delivered: prerecorded sales messages without consumers' express consent; telephone calls to consumers on the National Do Not Call ("DNC") registry; and telephone calls that failed to identify the seller of the services truthfully or promptly ("Count II").

## II.   Motion to Dismiss

### A.   Legal Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may dismiss a cause of action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

A complaint must contain more than "naked assertions," "labels and conclusions," or "a formulaic recitation of the elements of a cause of action."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007).  A complaint states a plausible claim "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court must accept all factual allegations pleaded in the complaint as true and and draw all reasonable inferences in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).  The court need not accept conclusory allegations as true; rather, it must "examine whether conclusory allegations follow from

23cv0313

the description of facts as alleged by the plaintiff." *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992) (citation omitted).

## B.   Claims Brought Under the TSR

### 1.   Ringless Voicemail and the TSR

Atlas moves to dismiss Plaintiff's claims brought under the TSR arguing ringless voicemails do not constitute "telephone calls" such that its conduct is outside the scope of the TSR.  (ECF No. 45-1 at 16–24.)  Atlas contends because ringless voicemails do not implicate consumers' telephone lines and cannot be answered, ringless voicemails are not "telephone calls."

First, Plaintiff has adequately alleged ringless voicemails use consumers' telephone lines.  At this procedural posture, the Court need not make a factual determination as to whether ringless voicemails ever use or rely on consumers' telephone lines.  Instead, the Court looks to whether Plaintiff has adequately alleged that they do.  Plaintiff alleges ringless voicemails "may in some circumstances make a partial ring or line 'tap' or 'ping' on a recipient's phone."  (Compl. at ¶ 41.)  Plaintiff also alleges Stratics's transmission records include consumers' cell phone numbers indicating a consumer's telephone number and telephone line is involved in the identification of their voicemail inbox.  (Compl. at ¶ 45.)  Plaintiff has thus adequately alleged ringless voicemails involve consumers' telephone lines.

Second, to the extent ringless voicemail does not implicate the use of telephone wires, it is nevertheless covered under the text of the TSR.  "Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction." *Minnick v. Comm'r*, 796 F.3d 1156, 1159 (9th Cir. 2015) (citations omitted).  The starting point is the "plain language" of the regulation. *See United States v. Bucher*, 375 F.3d 929, 932 (9th Cir. 2004).  "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citing *Burns v. Alcala*, 420 U.S. 575, 580–81 (1975)).  A court interprets a statute "to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174

- 5 -

(2001) (citation omitted).  This process of statutory interpretation proceeds "with reference to the statutory context, 'structure, history, and purpose' . . . not to mention common sense.'" *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)).

The Telemarketing Act empowers the FTC to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices."  15 U.S.C. § 6102.  The FTC is instructed to include in these rules "a requirement that telemarketers may not undertake a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy."  *Id.*  The Telemarketing Act does not anywhere define "telephone calls" for the purposes of the statute.  The TSR, promulgated under the Telemarketing Act, likewise does not define "telephone calls."

Looking to the ordinary, contemporary, and common meaning, "telephone call" encompasses ringless voicemails.  In this context, Merriam-Webster defines "call" as "the act of speaking to or attempting to reach someone by telephone or by a similar online communication service."  Merriam-Webster Online Dictionary, *Call*, https://www.merriam-webster.com/dictionary/call.  Oxford English Dictionary defines "telephone call" as "(a) the sound made by a ringing telephone (obsolete); (b) an instance of contacting someone by telephone; a telephone conversation."  Oxford English Dictionary, *Telephone Call*, https://www.oed.com/dictionary/telephone-call_n?tab=meaning_and_use&tl=true#9918838951.  While ringless voicemail may not always cause a consumer's phone to alert, a party delivering a ringless voicemail attempts to reach a recipient and deliver a message through the recipient's voicemail inbox.

An interpretation of "telephone call" that does not include ringless voicemail would defy the common meaning of "telephone call."  First, people often leave voicemails when they fail to speak live with their intended recipient.  Ringless voicemail is akin to leaving a voicemail when a consumer's phone is turned off and unable to ring or be answered.  Second, most consumers access their voicemail inbox via telephone.  Common meaning

then suggests the FTC intended to regulate ringless voicemail under the TSR regardless of whether the underlying technology uses telephone wires.

The structure and supporting text of the TSR also supports this reading. Courts have a "general 'reluctan[ce] to treat statutory terms as surplusage.'" *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2196 (2011) (quoting *Duncan*, 533 U.S. at 174). In the case of communications involving a prerecorded message, the TSR requires either: (1) a mechanism to assert a Do Not Call Request in "the case of a call that could be answered in person by a consumer"; or (2) a toll-free number to call to assert a Do Not Call Request "in the case of a call that could be answered by an answering machine or voicemail service." 16 C.F.R. § 310.4(b)(1)(v). The use of the word "could" is informative. A consumer "could" answer all calls that are not directly delivered to a consumer's voicemail. If the TSR was limited to only calls that could be answered by the consumer under Defendants' reading, the second possible case where a toll-free number must be provided would be surplusage.

The regulatory history of the TSR supports this reading. In 2006, the FTC considered an amendment to the TSR that would limit its restriction on prerecorded messages to only those calls "answered by a person." 73 Fed. Reg. 51163, 51164 (Aug. 29, 2008). The FTC received comments showing at least 80 percent of prerecorded telemarketing messages were delivered to an answering machine or voicemail. *Id.* at 51183. In assessing the proposed rule change, the FTC highlighted consumers who noted that prerecorded messages left on answering machines were no less intrusive than calls that were answered. *Id.* The Commission concluded "that a reasonable consumer would consider prerecorded telemarketing messages left on an answering machine or voicemail service to be abusive of such consumer's right to privacy." 73 Fed. Reg. at 51184. Ultimately, in 2008, the FTC elected not to revise the language of the TSR to apply to only those calls "answered by a person." *Id.* Ringless voicemails share the same privacy concerns as other telephone calls that result in a voicemail.

23cv0313

Finally, in the one prior instance of a court assessing this question, the court found "telephone call" under the TSR includes ringless voicemails. *See FTC v. Cardiff*, No. ED-CV-18-12104-DMG-PLAX, 2020 WL 6540509, at *17 (C.D. Cal. Oct. 9, 2020) (granting summary judgment that the TSR was violated by sending "prerecorded ringless voicemails" without an express agreement to "the placement of such calls"). And, while not the same statute, courts consistently find ringless voicemails constitute "calls" under the Telephone Consumer Protection Act of 1991 ("TCPA") and associated regulations by the Federal Communications Commission ("FCC"). *See, e.g.*, *Snyder v. Landcar Mgmt. Ltd.*, No. CV-22-00705-PHX-DLR, 2023 WL 2614960, at *3 (D. Ariz. Mar. 23, 2023); *Schaevitz v. Braman Hyundai, Inc.*, 437 F. Supp. 3d 1237, 1248–49 (S.D. Fl. 2019); *Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907, 912 (W.D. Mich. 2018).

Accordingly, the Court denies Defendants' motions to dismiss on the basis that ringless voicemails are not telephone calls.

## 2. Debt Relief Service

Plaintiff alleges Atlas violated Section 5 of the FTC Act by making misrepresentations regarding a debt relief service. (Compl. at ¶¶ 127–30.) Plaintiff further alleges Atlas and Ace charged or received a fee in advance of providing a debt relief service in violation of the TSR. (*Id.* at ¶ 144.)

Ace and Atlas argue Plaintiff does not adequately plead they made misrepresentations or charged advance fees with respect to a debt relief program because they only draft and send debt validation letters on behalf of consumers. (ECF No. 42-1 at 20–22; ECF No. 45-1 at 39.) They argue because the debt validation letters do not "alter the terms of payment or other terms of the debt," Plaintiff cannot adequately plead they offer a "debt relief service." (ECF No. 45-1 at 41.) Atlas additionally argues Plaintiff fails to plead with particularity its allegations that Atlas misrepresents its debt relief service under Rule 9(b) of the Federal Rules of Civil Procedure. (*Id.*)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### i)      Definition of Debt Relief Service

The TSR defines "debt relief service" as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors[.]" 16 C.F.R. § 310.2(o).  This definition is made in "broad terms."  *CFPB v. IrvineWebWorks, Inc.*, No. SACV 14-1967 JVS, 2016 WL 1056662, at *6 (C.D. Cal. Feb. 5, 2016).  Regardless of whether it actually alters or settles the debt, a provider is liable under the TSR if it represents its services as altering or settling a debt.  *See FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067, 1082–83 (N.D. Cal. 2018); *IrvineWebWorks*, 2016 WL 1056662, at *6–7.

Here, Plaintiff alleges Atlas left robocalls describing its "debt relief program" as offering "affordable payment options" which "in most cases, can have [the consumer] out of credit card debt in 24 months or less." (Compl. at ¶ 66.)  These statements represent by implication that Atlas will settle or alter the terms of payment between the consumer and the debt collector.   As follows, even if Atlas did not subsequently provide services amounting to debt relief, Plaintiff adequately alleges that Atlas represents it provides a "debt relief service."

Plaintiff alleges Ace made representations to consumers about how their monthly payments would be used and referred consumers back to the enrollment agent if they disagreed with Ace's representations about the service.  (Compl. at ¶77; ECF No. 42-4 at 22.)  This participation is sufficient to allege that Ace represented it provided debt relief services.  Ace subsequently collected fees before any debt relief services were provided. (Compl. at ¶ 81.)  While Ace argues these facts are untrue, that question is not before the Court in a motion to dismiss.

Accordingly, Ace's and Atlas's motions to dismiss on this basis are denied.

23cv0313

### ii)    Particularity Requirement

Atlas also contends Plaintiff fails to plead its allegations with particularity because Federal Rule of Civil Procedure 9(b) applies to claims brought under Section 5 of the FTC Act.

Federal Rule of Civil Procedure 9(b) requires when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  "Rule 9(b) applies when (1) a complaint specifically alleges fraud as an essential element of a claim, (2) when the claim 'sounds in fraud' by alleging that the defendant engaged in fraudulent conduct, but the claim itself does not contain fraud as an essential element, and (3) to any allegations of fraudulent conduct, even when none of the claims in the complaint 'sound in fraud.'" *Davis v. Chase Bank U.S.A., N.A.*, 650 F. Supp. 2d 1073, 1089–90 (C.D. Cal. 2009) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102–06 (9th Cir. 2003)).

The Ninth Circuit has not resolved the question of whether Rule 9(b) applies to deceptive acts or practices claims under Section 5 of the FTC.  A number of district courts in the Ninth Circuit, however, have found Rule 9(b) applies to Section 5 claims because Section 5 claims "sound in fraud" by alleging the defendant acted fraudulently.  *See FTC v. Lights of Am., Inc.*, 760 F. Supp. 2d 848, 853 (C.D. Cal. 2010); *FTC v. Swish Mktg.*, No. C-0903814-RS, 2010 WL 653486, at *3 (N.D. Cal. Feb. 22, 2010).  In contrast, other courts have declined to apply Rule 9(b) because Section 5 claims do not require proof of scienter, reliance, or injury such that they are dissimilar from common law fraud claims.  *See, e.g.*, *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1204 n.7 (10th Cir. 2005); *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 314 (S.D.N.Y. 2008).  The Court, however, need not weigh in as to whether Rule 9(b) applies because Plaintiff has met its standard with respect to the alleged fraud here.

To satisfy Rule 9(b), a plaintiff must include the "who, what, when, where, and how" of the fraud including what is false about a statement and why it is false. *Vess*, 317 F.3d at

23cv0313

1106 (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).  "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (citation omitted).  *See also Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). A motion to dismiss under Rule 9(b) for failure to plead with particularity "is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim" where unspecific averments are disregarded in the complaint.  *Id.* at 1107.

Plaintiff alleges the "who, what, when, where, and how" of the alleged fraud. Plaintiff alleges the content of the alleged misrepresentations and identifies the parties who made the alleged misstatements.  (Compl. at ¶¶ 128, 129.)  Plaintiff also explains how the alleged misrepresentations are false.  For example, Ace and Atlas allegedly received monthly fees from consumers for months without ever "renegotiating, settling, reducing, or otherwise altering the terms of the consumer's debt" contrary to their sales statements. (Compl. at ¶¶ 81, 82.)  Plaintiff also identifies the relevant time frame for its allegations, where the misconduct took place, and how the fraud was perpetrated.  Namely, from at least September 2019 until November 2020 (the "when"), Atlas in concert with Ace used Stratics's (the "who") ringless voicemail service to deliver prerecorded messages to consumers throughout the United States (the "where") to provide a "debt relief program" (the "what") to consumers without actually renegotiating, settling, or altering the terms of that debt (the "how").  "Rule 9(b) requires no more."  *See FTC v. DeVry Educ. Grp., Inc.*, No. CV-16-00579-MWF-SSX, 2016 WL 6821112, at *6 (C.D. Cal. May 9, 2016).

Atlas's motion to dismiss on this basis is thus denied.

### 3.    Participation as Telemarketer or Seller

Ace claims Plaintiff fails to allege violations of the TSR because only telemarketers or sellers are liable under the TSR and Ace is neither.  (ECF No. 42-1 at 16.)  Under the TSR, it is an abusive telemarketing act for "any **seller or telemarketer** to engage in . . .

[r]equesting or receiving payment of any fee or consideration for any debt relief service until and unless" the seller or telemarketer has altered the terms of at least one debt, the customer has made one payment pursuant to the new debt agreement, and the fee or consideration is either proportional to the renegotiation fee or is a percentage of the amount saved.  16 C.F.R. § 310.4(a)(5)(i) (emphasis added).  Ace argues its quality control calls failed to induce any purchases, which means it cannot be a telemarketer, and it did not receive any consideration from consumers in exchange for its services, which means it cannot be a seller.  (ECF No. 42-1 at 16–20.)  Ace asserts Plaintiff has therefore failed to plead its conduct is actionable under the TSR.

Ace argues Plaintiff failed to plead it is a telemarketer because telemarketing involves the inducement of purchasing goods or services and Ace does not induce any purchases.  (ECF No. 42-1 at 16–18.)  Under the TSR, a telemarketer is defined as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2.  The TSR defines telemarketing as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." *Id.*

There is an outstanding question as to the scope of the TSR's language "in connection with telemarketing" and whether it incorporates parties who receive phone calls connected to the telemarketing scheme but do not actively participate in the scheme.  The Court need not reach this question, however, because Plaintiff has sufficiently alleged Ace induced the purchase of services by consumers.  According to the Complaint, Ace received telephone calls in conjunction with telemarketing, and Ace made representations to consumers about how their monthly payments would be used.  (Compl. at ¶ 77.)  And according to the Complaint, Ace also confirmed the consumer's banking information, the payment amount, and the draft date.  (*Id.*)  The Complaint further alleges Ace's statements resulted in consumer confusion in some instances from which the Court can infer Ace makes representations about the services to be purchased.  (*Id.*)  Put together, Plaintiff

alleges the transaction was not complete in some instances until Ace finished its quality control call.  As follows, the Complaint then alleges Ace participated in the inducement of the purchase of services.

Ace nevertheless argues it only engaged in quality control calls akin to messages confirming registration.  First, the Court need not make such factual findings in evaluating a motion to dismiss. [1]  Second, Plaintiff has alleged that Ace engaged in more than mere registration of customers.  A comparison with the TCPA is informative.  Under the TCPA, parties are prohibited from making unsolicited calls using an autodialer where the call "includes or introduces an advertisement or constitutes telemarketing."  47 C.F.R. § 64.1200(a)(2).  Telemarketing is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12).  This language tracks the definition of telemarketing under the TSR.

Courts have previously held that routine messages sent as part of the registration process do not constitute telemarketing under the TCPA.  For example, a text message asking the user to "Please enter your car2go activation code 145858 into the emailed link" did not constitute telemarketing because there was no indication the text was for anything more than to complete the registration and did not divert to marketing materials.  *See Aderhold v. Car2go N.A., LLC*, No. 13-cv-00489, 2014 WL 794802, at *9 (W.D. Wash. Feb. 27, 2014).  Similarly, a message confirming registration had occurred was not found

---

[1] Ace insists the Court should consider its quality control script and service agreement with Atlas as part of its motion to dismiss because Plaintiff "extensively relies on the Quality Control Call Script" and contract with Ace such that they are incorporated by reference in Plaintiff's Complaint. (ECF No. 61 at 10.)  The Court is not convinced.  Ordinarily, when ruling on a Rule 12(b)(6) motion to dismiss, if a trial court considers evidence outside the pleadings, it must convert the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment.  *See* Fed. R. Civ. P. 12(b).  The court may, however, consider external evidence in a Rule 12(b)(6) motion where the document is incorporated by reference in the complaint because the plaintiff "refers extensively to the document or the document forms the basis of the plaintiff's claim."  *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).  Plaintiff does not base its claim on the content of Ace's quality control script or service agreement with Atlas and does not refer to these documents by name.  Accordingly, the Court declines to incorporate these documents by reference as part of Defendant's motion to dismiss.

to be telemarketing because it was too attenuated from other marketing materials to encourage future purchases. *See Daniel v. Five Stars Loyalty, Inc.*, No. 15-cv-03546-WHO, 2015 WL 7454260, at *4 (N.D. Cal. Nov. 24, 2015).

Here, the Complaint alleges greater participation on the part of Ace. First, the Complaint alleges Ace employees were involved with customers during the transaction and not solely involved after the fact. For instance, the Complaint alleges "[i]n numerous instances, consumers were subsequently transferred" to Ace employees during the transaction process. (Compl. at ¶ 75.) Second, the Complaint alleges Ace did more than merely provide instructions on how to complete registration or administer post-transaction customer satisfaction surveys. Specifically, the Complaint alleges Ace made representations about how consumers' monthly payments would be used and that Ace's representations would sometimes conflict with the representations offered by Atlas. (Compl. at ¶ 77.) Examining the facts in the light most favorable to Plaintiff, Plaintiff sufficiently alleges Ace participated in the inducement of the purchase of services and therefore acted as a telemarketer.

Because the Complaint adequately alleges Ace acts as a telemarketer, the Court need not address whether Ace also acts as a seller under the TSR. Accordingly, Ace's motion to dismiss on this basis is denied.

### 4.    Knowledge and Civil Penalties

Atlas and Ace claim Plaintiff cannot pursue civil penalties because they lacked knowledge that use of a ringless voicemail constituted a "telephone call" under the TSR. (ECF No. 45-1 at 36–39; ECF No. 42-1 at 31–32.) Atlas contends the FTC did not adequately express that the TSR covers ringless voicemails such that Atlas did not have knowledge or fair notice that its conduct was prohibited. Similarly, Ace argues Plaintiff has failed to plead sufficient facts alleging it knew its conduct violated the TSR.

The FTC can only pursue civil penalties against persons or corporations that violate the FTC Act "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C.

§ 45(m)(1)(A).  The Supreme Court has suggested this provision allows for a mistake-of-law defense to civil liability such that a defendant is not liable where it is "unaware of the relevant federal prohibition" and would not reasonably have known its conduct was unlawful.  *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583–84 (2010) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536–37 (1999)).[2]  *See also United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996) (applying 15 U.S.C. § 45(m)(1)(A)).

In the pleading context, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  In the posture before the Court, the Court need not decide whether Defendants had actual knowledge of the TSR's application; rather, Plaintiff need only plausibly state Defendants had knowledge or were on notice that the TSR applied to survive a motion to dismiss.  *See, e.g.*, *FTC v. Benning*, No. C 09-03814-RS, 2010 WL 2605178, at *5 (N.D. Cal. June 28, 2010) (noting factual disputes about whether a defendant was actually aware of the nature of the fraud or its illegality are not appropriately weighed on a motion to dismiss).

Plaintiff has alleged Atlas and Ace plausibly had knowledge their conduct was regulated by the TSR. First, the FTC has engaged in prior enforcement actions against ringless voicemail providers.  In 2018, the FTC brought suit against Jason Cardiff and Eunjung Cardiff alleging a telemarketing scheme in violation of the TSR that involved the delivery of 1.5 million ringless voicemail messages to consumers' voicemails.  *Cardiff*, 2020 WL 6540509, at *9.  The FTC publicized this action as part of a larger crackdown against telemarketers and highlighted that its settlement with one party prohibited her from using ringless voicemails.  *See* FTC, *FTC, Law Enforcement Partners Announce New*

---

[2] The Supreme Court has not ruled directly on whether Section 45(m)(1)(A) of the FTC Act includes a mistake-of-law defense.  In *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, the Supreme Court assessed whether Section 813(c) of the Fair Debt Collection Practices Act ("FDCPA") contains a mistake-of-law defense. 559 U.S. 573.  The Supreme Court held the FDCPA does not contain such a defense because "when Congress has intended to provide a mistake-of-law defense to civil liability, it has often done so more explicitly" and offered Section 45(m)(1)(A) of the FTC Act as an example where Congress has offered such a defense.  *Id.* at 583–84.

23cv0313

*Crackdown on Illegal Robocalls*, June 25, 2019, https://www.ftc.gov/news-events/news/press-releases/2019/06/ftc-law-enforcement-partners-announce-new-crackdown-illegal-robocalls. The FTC has also sent letters to multiple VoIP service providers, which transmit calls through internet services, warning that their conduct was proscribed by the TSR. *See* FTC, *FTC Warns Nine VoIP Service Providers and Other Companies against "Assisting and Facilitating" Illegal Coronavirus-related Telemarketing Calls*, March 27, 2020, https://www.ftc.gov/news-events/news/press-releases/2020/03/ftc-warns-nine-voip-service-providers-other-companies-against-assisting-facilitating-illegal. These enforcement actions were brought before the alleged misconduct here.

Second, Plaintiff alleges Atlas and Ace received consumer complaints alleging violations of federal telemarketing regulations. (Compl. at ¶ 84.) Plaintiff does not allege the content of these messages, but it is plausible these messages served as notice for Atlas and Ace that their conduct violated the TSR. *See, e.g.*, *FTC v. Day Pacer LLC*, No. 19 CV 1984, 2023 WL 5671618, at *16 (N.D. Ill. Sept. 1, 2023) (noting defendants received consumer complaints as a basis for imputing knowledge of TSR violations); *United States v. MyLife.com*, 499 F. Supp. 3d 751, 755 (C.D. Cal. 2020) (holding knowledge can be inferred where MyLife.com received prior consumer complaints that their practices violated the FTC Act).

Atlas contends its employment of regulatory counsel shows it lacked sufficient knowledge that its conduct was proscribed by the TSR to permit civil penalties. (ECF No. 63 at 21–22.) Plaintiff argues Defendants' retention of regulatory counsel show they were aware their conduct was subject to the rules of the TSR. (Compl. at ¶ 84.) Neither argument is persuasive. Retention of counsel or advice of counsel are not valid defenses to the question of knowledge under the FTC Act. *See FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1202 (9th Cir. 2006); *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1084 (C.D. Cal. 2012). However, the retention of counsel does not show a party knew its conduct was prohibited either.

23cv0313

At bottom, Plaintiff's Complaint plausibly alleges Defendants had knowledge of the TSR and its application to their conduct.  Accordingly, Defendants' motion to dismiss Plaintiff's request for civil penalties is denied.

### 5.    Individual Defendants

Atlas argues Plaintiff's claims seeking to impose individual liability against DiRoberto and Petersen should be dismissed because they lacked sufficient involvement in the scheme and the requisite knowledge that the scheme was unlawful.  (ECF No. 45-1 at 45–46.)

To establish individual liability under the FTC Act, an individual must have "participated directly in the acts or practices or had authority to control them" and "had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted." *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138 (9th Cir. 2010) (quoting *FTC v. Pub'l Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997).  An individual's status as a corporate officer or ownership over a corporation is generally sufficient to establish the requisite control.  *See, e.g.*, *FTC v. Lights of Am.*, No. cv-10-1333, 2011 WL 1515158, at *3 (C.D. Cal. Mar. 31, 2011).  A plaintiff can establish knowledge by showing that an individual "had actual knowledge of material misrepresentations, [was] recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.*  (citation omitted).

Atlas cites *FTC v. Swish Marketing* arguing the claims against Petersen and DiRoberto should be dismissed.  No. C-09-038140-RS, 2010 WL 653486 (N.D. Cal. Feb. 22, 2010).  In *Swish Marketing*, the FTC alleged Swish Marketing and three of its officers violated Section 5 of the FTC Act in connection with a prepaid debit card scheme.  *Id.* at *1.  Individual defendant and CEO of Swish Marketing, Mark Benning, moved to dismiss the claims against him for only pleading conclusory allegations of his control over the corporation by virtue of his status as CEO alone and not providing any detail about his

knowledge of the alleged malfeasance. *Id.* at *5. Without "facts to tie Benning to the debit card scheme or to suggest his knowledge," the district court dismissed the allegations against him. *Id.*

Those ills do not befall Plaintiff's Complaint here. First, Plaintiff adequately pleads Petersen and DiRoberto had the authority to control Atlas's allegedly deceptive acts because they are co-owners of the corporation. (Compl. at ¶¶ 14–15.) This case is distinguishable from *Swish Marketing* because Atlas is alleged to be closely held, which implies greater control. *See, e.g.*, *FTC v. Wellness Support Network, Inc.*, No. C-10-04879-JCS, 2011 WL 1303419, at *10 (N.D. Cal. Apr. 4, 2011); *MyLife.com*, 499 F. Supp. at 754–55. Second, Plaintiff sufficiently pleads Petersen and DiRoberto had knowledge of the underlying corporate misconduct. Plaintiff alleges Petersen helped draft scripts for the prerecorded messages and alleges Petersen and DiRoberto received consumer complaints related to telemarketing regulation violations. (Compl. at ¶¶ 68, 84.) DiRoberto is also alleged to have been involved in prior TSR litigation, and Petersen is alleged to have participated in an FTC investigational hearing related to Atlas's debt relief service and representations about it. (Compl. at ¶ 84.)

Accordingly, Plaintiff sufficiently pleads Petersen's and DiRoberto's knowledge and control of or participation in the alleged telemarketing scheme. Atlas's motion to dismiss the allegations against them is denied.

## C.    Section 230 of the Communications Decency Act

Stratics argues it is immune from liability under Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230. Stratics contends it is immune from this suit because it is an interactive computer service, Atlas provides the content at issue, and the Complaint seeks to hold Stratics liable based on the content Atlas provides and Stratics publishes. (ECF No. 50-1 at 20–23.)

Congress enacted the CDA to promote the free exchange of information over the internet and encourage voluntary monitoring of offensive material. *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003). Congress sought to immunize

23cv0313

internet service providers from liability related to the content they host in order to avoid imposing content moderation duties on service providers. *Id.* at 1123–24. The CDA affirms "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). And "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). The Ninth Circuit has interpreted the CDA to establish broad federal immunity to actions that would make service providers liable for content originating from third-party users of the service. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007).

The Ninth Circuit articulated a three-prong test for immunity under the CDA. Immunity from liability exists for "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009). Plaintiff's Complaint alleges these elements with respect to Stratics such that Stratics is thus immune.

### 1. Interactive Computer Service

Stratics argues its voicemail delivery services is an interactive computer service because it allows access by multiple users, even if they are not accessing the same content, and its delivery service transmits content. (ECF No. 50-1 at 20.) Plaintiff contends Stratics is not an interactive computer service because recipients access their voicemails through their telephones rather than a computer and granting Stratics immunity would undermine the goals of the CDA. (ECF No. 55 at 41–45.)

The CDA defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2). Courts interpret this term broadly. *See In re Zoom Video Commc'ns Inc. Privacy Litig.*, 525 F. Supp. 3d 1017, 1029 (N.D. Cal. 2021)

23cv0313

(discussing the expansiveness of the CDA's statutory text and courts' subsequent expansive interpretations).  "The prototypical service qualifying for [CDA] immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others."  *Dryoff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019).  However, a provider need not be the prototypical example to still be an interactive computer service.  Rather, any information service or access software provider capable of being accessed by multiple users qualifies under the CDA.  *See Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1168, 1175–76 (9th Cir. 2009).

The facts alleged in the Complaint show that Stratics meets this element.  First, Stratics is an "access software provider."  "Access software providers" include software providers that "transmit, receive, display, [or] forward . . . content."  47 U.S.C. § 230(f)(4).  Stratics provides software allowing users to transmit messages to consumers' voicemails.  (Compl. at ¶ 39.)  Voicemail messages are indisputably content.  Second, Stratics "provides or enables computer access by multiple users to a computer server."  47 U.S.C. § 230(f)(4).  Stratics's software allows any number of customers to access its voicemail computer servers to deliver messages.  (Compl. at ¶ 42.)  Thus, by the plain text of the CDA, Stratics is an interactive computer service.

Plaintiff argues that because multiple users cannot access the same content, Stratics is not an interactive computer service.  (ECF No. 55 at 43.)  Under the CDA, however, this is not required to obtain immunity.  For example, Twitter is still an interactive computer service for its direct messages, which are nonpublic, because multiple users can access the site.  *See Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1128 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018).  Similarly, Stratics does not need to make content publicly available to qualify as an interactive computer service.  For example, Zoom still qualifies as an interactive computer service for private video calls because Section 230 only requires that Stratics "provides or enables computer access by multiple users to a computer server."  *See In re Zoom*, 525 F. Supp. 3d at 1030.  Finally, the CDA does not require Stratics to distribute content over the internet.  For example, Twitter is still an interactive computer

23cv0313

service even if some messages are delivered via text messages because users can access the service via the internet.  *See, e.g.*, *Nunes v. Twitter, Inc.*, 194 F. Supp. 3d 959, 967 (N.D. Cal. 2016).

Plaintiff insists Stratics nevertheless cannot claim immunity under the CDA because it does not seek to hold Stratics liable "in its role as a provider or user of a computer service" but instead for the conduct associated with distributing users' messages. (ECF No. 55 at 43.)  *See Batzel v. Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003).  Plaintiff argues to grant Stratics immunity would be akin to granting a newspaper immunity for publishing defamatory advertisements in hardcopy form because those advertisements were submitted via an online webportal.  (ECF No. 55 at 43.)

The Court disagrees.  First, courts have collapsed any distinction between distributor liability and publisher liability under the CDA unlike traditional print, television, and radio media.  *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 332 (4th Cir. 1997) (discussing how Zeran's attempt to impose liability on AOL for distributing content transforms AOL into a publisher); *Batzel*, 333 F.3d at 1026–27.  The CDA was designed to avoid imposing requirements on service providers to make "a legal judgment concerning the information's defamatory character, and an on-the-spot editorial decision whether to risk liability by allowing the continued publication of that information" because while "this might be feasible for the traditional print publisher, the sheer number of postings on interactive computer services would create an impossible burden in the Internet context." *Zeran*, 129 F.3d at 333.  It ultimately does not matter that voicemail messages are delivered to consumers' voicemails and are not accessed via a computer.  Stratics would be forced to perform the content moderation responsibilities the CDA seeks to avoid if it were held liable. *Id.*

At oral argument, the Court queried Plaintiff if there would be a way to identify ringless voicemails that violate the TSR without reviewing the content of the messages uploaded to Stratics's servers.  Plaintiff did not volunteer a method that could identify problematic telemarketing voicemails and other non-telemarketing content, such as

political calls, without reviewing the content of the messages.  If the facts of this case were different, and Plaintiff could readily claim that Stratics only services telemarketers or that Stratics was designed by a single telemarketing firm to distribute telemarketing voicemails, Stratics would not be burdened by content moderation duties.  The Court could then separate conduct and content accordingly.  Here, however, that is not the case because, as discussed below, Stratics is only liable according to the content of the ringless voicemails distributed to consumers.

Accordingly, because Stratics transmits content and because Stratics provides access to multiple users to a computer server, Stratics is an interactive computer service.

### 2.    Treatment as Publisher or Speaker

Plaintiff argues Stratics is not being treated as a publisher because its TSR violations do not depend on the content of the transmitted messages.  (ECF No. 55 at 45–46.)  The CDA defines an "information content provider" as an "entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  Parties are held liable as information content providers under the CDA where "the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1102.

Plaintiff's Complaint alleges Stratics provided substantial assistance to sellers or telemarketers in violation of the TSR for: (1) initiating outbound prerecorded telephone calls to induce the purchase of goods or services; (2) initiating outbound telephone calls to consumers on the National DNC registry to induce the purchase of goods or services; and (3) failing to disclose the identity of the seller of the goods or services truthfully, promptly, and clearly.  (Compl. at ¶ 132.)  Each of these claims derives from Stratics's status as a publisher or speaker.

The CDA contains two exceptions to being treated as a publisher under the CDA.  First, Section 230 does not immunize providers against content-neutral claims.  *Barnes*, 570 F.3d at 1102.  In *Homeaway.com v. City of Santa Monica*, a local ordinance required

23cv0313

short-term rental platforms, like VRBO, to deny booking any properties not licensed and registered with the city.  918 F.3d 676, 680 (9th Cir. 2019).  The Ninth Circuit found Section 230 did not immunize online booking platforms from liability because the ordinance does not "discuss the content of the listings that the Platforms display on their websites. It requires only that transactions involve licensed properties."  *Id.* at 683 (citations omitted).  Because the platforms "face no liability for the content of the bookings," the CDA permits enforcement under the ordinance against online providers. *Id.* at 684.

Second, Section 230 permits claims that do not derive from the defendant's status as a publisher or speaker.  *Barnes*, 570 F.3d at 1102.  Section 230 "does not declare 'a general immunity from liability deriving from third-party content.'"  *Doe v. Internet Brands*, 824 F.3d 846, 852 (9th Cir. 2016) (quoting *Barnes*, 570 F.3d at 1100).  Rather, claims that are brought as a result of duties outside of the party's status as a publisher or speaker are still generally actionable. For example, contractual duties, supervisory duties, and tort duties, including a failure to warn, may still be brought against providers because those claims arise outside the zone of free speech and publisher interests Congress sought to protect in enacting the CDA. *See, e.g.*, *Internet Brands*, 824 F.3d at 853; *Barnes*, 570 F.3d at 1108; *Roommates.com*, 521 F.3d at 1164 n. 15.

Neither exception applies here.  With respect to content neutrality, each alleged violation is premised on the content of the messages delivered using Stratics's ringless voicemail system.  While Stratics's conduct—namely its ringless voicemail delivery system—is the basis for its alleged substantial assistance, Stratics is only liable because of the content of the messages delivered.  Claims 1 and 2 allege Stratics delivered calls to induce the purchase of goods or services.  If Stratics's customers were not hawking their wares, Stratics would not be liable for providing substantial assistance.  Claim 3 alleges Stratics provided substantial assistance to Stratics customers who did not appropriately disclose their identities in attempting to induce the purchase of goods or services.  If

Stratics's customers had disclosed their identities, Stratics would not be liable. Accordingly, these claims are not content-neutral.

A comparison with claims brought under the TCPA is instructive. In *Nunes v. Twitter, Inc.*, the plaintiff sued Twitter for unwanted text message delivery of tweets posted to Twitter. 194 F. Supp. 3d 959, 968 (N.D. Cal. 2016). The TCPA makes it unlawful "to make any call" using "an automatic telephone dialing system" without "the prior express consent" of the recipient. 47 U.S.C. § 227(b)(1)(A). The *Twitter* court found the TCPA strictly prohibits text messages sent without the recipient's consent regardless of "whether the content of the unwanted [texts] is bad or good, harmful or harmless." *Twitter*, 194 F.Supp. 3d at 968. The court favorably compared the action to suing a delivery person for nuisance for noisily throwing an unwanted newspaper at the door in the morning rather than suing the deliveryman because the newspaper contained false gossip. *Id.* at 967. Because the call itself, rather than its content, violates the TCPA, Section 230 did not immunize Twitter from liability. *Id.* at 968.

In contrast, the TSR prohibits only abusive telephone calls from telemarketers and sellers. 16 C.F.R. § 310.4. Parties are only sellers or telemarketers according to the content of their speech. *See* 16 C.F.R. § 310.2. To adopt the *Twitter* court's analogy, claims can only be brought under the TSR for the noisy delivery of a sales catalogue rather than the noisy delivery of any publication. *See Twitter*, 194 F. Supp. 3d at 967. Thus, Stratics's conduct is only actionable by way of its content. To avoid liability for providing substantial assistance, Stratics must monitor and screen the content of users' voicemail messages. The CDA was enacted specifically to avoid imposing these moderation duties on providers. *See Homeaway.com*, 918 F.3d at 682.

With respect to the second exception to the CDA, Plaintiff's claims are also derived from Stratics's status as a publisher or speaker. What matters under the CDA "is not the name of the cause of action . . . [but] whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Barnes*, 570 F.3d at 1102. Stratics allegedly provides substantial assistance to

- 24 -

sellers and telemarketers by virtue of distributing their content.  (Compl. at ¶¶ 53–58.)  Distribution of content is quintessential publishing activity.  *Barnes*, 570 F.3d at 1102*.*  Other courts have similarly held that actions attempting to hold platforms liable for "harmful content" on their network treat those platforms as the publisher.  *See, e.g.*, *Green v. Am. Online, Inc.*, 318 F.3d 465, 471 (3d Cir. 2003) (holding the CDA applies to claims against AOL for allowing malware to be distributed through an AOL chat room).  As it stands, the Complaint does not allege claims that derive from legal obligations, like contractual or tortious duties, separate from Stratics's status as a publisher.

### 3.    Content Provided by Third Parties

To obtain immunity under Section 230, the offensive content must come from third parties.  The CDA is inapplicable to an "information content provider," which is defined as someone who "is responsible, in whole or in part, for the creation or development of" the offensive content.  47 U.S.C. § 230(f)(3).  The Ninth Circuit has held this limitation extends to providers who develop the tools or content that are deemed offensive.  *See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1166 (9th Cir. 2008) (finding Roommates.com became "much more than a passive transmitter" of discriminatory information by providing "a limited set of pre-populated answers"); *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021) (holding plaintiff's claims turned on Snap's own design feature such that Snap was responsible, in part, for the offensive content).

Based on the pleadings, Plaintiff seeks to hold Stratics liable for content generated by third party users.  Stratics's users generate the prerecorded messages distributed using Stratics's platform. (Compl. at ¶¶ 41–42.)  While Stratics developed the ringless voicemail technology at issue, that development goes to how the third-party content is distributed rather than the content itself.  Therefore, third parties generate the offensive content alleged in Plaintiff's Complaint.

Accordingly, the factual allegations of Plaintiff's Complaint entitle Stratics to CDA immunity.  Plaintiff's claim against Stratics is dismissed.  Ordinarily under Rule 15(a) of

23cv0313

the Federal Rules of Civil Procedure, where a complaint fails to state a plausible claim, the court "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (internal quotations omitted). It is clear from the Complaint that Plaintiff's claim against Stratics is premised on treating Stratics as publishers of third-party content distributed by its software and that this claim is barred by the CDA. *See Sikhs for Just., Inc. v. Facebook, Inc.*, 697 Fed. App'x 526 (9th Cir. 2017) (affirming dismissal with prejudice because granting plaintiff "leave to amend its complaint would have been futile" where plaintiff's claim was "barred by the CDA"); *Doe v. Grindr Inc.*, No. 2:23-CV-02093-ODW-PDX, 2023 WL 9066310, at * (C.D. Cal. Dec. 28, 2023) (dismissing without leave to amend where "the core theory" of the complaint seeks to treat the defendant as a "publisher or speaker of third-party content"); *Bride v. Snap Inc.*, No. 2:21-CV-06680-FWS-MRW, 2023 WL 2016927, at *8 (C.D. Cal. Jan. 10, 2023) (dismissing claims with prejudice because the CDA bars plaintiff's claims); *King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 795 (N.D. Cal. 2021) (finding amendment would be futile because the defendant was immunized by the CDA).

Identifying no facts that could cure this deficiency, the Court dismisses the Complaint against Stratics with prejudice.

## III.   Motion to Strike

Atlas moves to strike Plaintiff's Complaint asserting it cannot seek civil penalties. (ECF No. 45-1 at 15.) Federal Rule of Civil Procedure ("Rule") 12(f) provides that a court may strike from a pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).

"Motions to strike are generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying

tactic." *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1152 (C.D. Cal. 2003). "[The] motion . . . should not be granted unless the matter to be stricken clearly could have no possible bearing on the subject of the litigation. If there is any doubt . . . the court should deny the motion." *Platte Anchor Bolt, Inc. v. IHI, Inc*., 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004) (citations omitted).

As discussed, Plaintiff has plausibly alleged Atlas violated the TSR and plausibly alleged Atlas had knowledge that its conduct violated the TSR. Accordingly, Atlas's motion to strike is denied.

## IV.    For Cause Removal Protections

Atlas and Ace argue the present suit is constitutionally infirm because the FTC Commissioners who referred the suit to the Department of Justice ("DOJ") hold unconstitutional offices such that their authorization for Plaintiff to bring suit is void. (ECF No. 42-1 at 32–33.) Defendants assert the Commissioners' offices violate the separation of powers and Article II of the Constitution because FTC Commissioners can only be removed for-cause and FTC Commissioners wield executive powers. (*Id.*)

The FTC is headed by a commission of five members who are appointed by the President and confirmed by the Senate. 15 U.S.C. § 41. The Commission members serve staggered, seven-year terms with only three members permitted to be from the same political party. *Id.* By statute, the President can remove a Commission member only for good cause identified as "inefficiency, neglect of duty, or malfeasance in office." *Id. See Humphrey's Ex'r v. United States*, 295 U.S. 602, 620 (1935). This good cause removal provision stands in contrast to the general rule allowing the President to remove executive officials from office at will under Article II of the Constitution. *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197–98 (2020) (discussing *Myers v. United States*, 272 U.S. 52 (1926)); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 513–14 (2010) (noting the President generally has "the authority to remove those who assist him [or her] in carrying out his [or her] duties").

The Supreme Court has held Congress's ability to impose removal restrictions "will depend upon the character of the office." *Seila Law*, 140 S.Ct. at 2198 (quoting *Myers*, 295 U.S. at 620). The character of an office is examined along two bases: functional characteristics, in terms of what functions and duties are performed by the agency or office, and structural characteristics, in terms of how the agency, office, or removal restriction is structured. *Id.* at 2198–99.

Approximately eighty years ago, in *Humphrey's Executor v. United States*, the Supreme Court upheld the FTC's good cause removal provision along functional grounds finding the FTC's powers were non-executive because the Commission "acts in part quasi legislatively and in part quasi judicially" by "filling in and administering the details" of what constitutes unfair competition. 295 U.S. at 624. Because it is an "administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed," the FTC "cannot in any proper sense be characterized as an arm or an eye of the executive." *Id.* at 628.

Defendants argue the responsibility and functions of the FTC have grown in the years since *Humphrey's Executor* such that the FTC now exercises executive powers. (ECF Nos. 42-1 at 228, 50-1 at 47.) Specifically, they highlight the powers to obtain civil penalties under Section 45(m) and consumer redress under Section 57b as impermissibly granted, executive litigation powers. (ECF No. 45-1 at 35; 42-1 at 33; 50-1 at 49–50.) The Ninth Circuit has previously addressed this question in *FTC v. Am. Nat. Cellular, Inc.* and determined Section 45 did not offend the principle of separation of powers. 810 F.2d 1511, 1514 (9th Cir. 1987). While the FTC obtained authority to seek injunctive relief and monetary penalties, these functions are not so different from the ability to seek cease and desist orders or order administrative remedies as upheld in *Humphrey's Executor*. *Id.*

Beyond function, the structure of the FTC also permits the Commission members' for-cause removal protections. The Supreme Court previously held the Consumer Finance Protection Bureau ("CFPB") and the Federal Housing Finance Authority ("FHFA") had unconstitutional removal protections according to their structures. *See Seila Law*, 140 S.

Ct. at 2197; *Collins v. Yellen*, 141 S.Ct. 1761, 1784 (2021).  The FTC's structure, however, differs in important ways from these agencies.  First, the FHFA and the CFPB were led by single directors.  *Seila Law*, 140 S.Ct. at 2192; *Collins*, 141 S.Ct. at 1784.  In contrast, the FTC is headed by a five-person directorate.  Second, because the CFPB director serves a five-year term, "some Presidents may not have any opportunity to shape its leadership and thereby influence its activities."  *Seila Law*, 140 S. Ct. at 2204.  In contrast, FTC Commissioners serve staggered seven-year terms such that every elected President will have the opportunity to appoint Commissioners and shape the direction of the agency.  Indeed, the FTC's structure was designed for presidents to influence the direction of the agency without wholesale changes to federal competition law.  Third, the CFPB receives money from the Federal Reserve, which is outside of the appropriations process, such that the CFPB may further "slip from the Executive's control, and thus from that of the people." *Free Enter. Fund*, 561 U.S. at 499; *Seila Law*, 140 S. Ct. at 2204.  The FTC receives funding from the standard appropriations process and is thus accountable through that mechanism.  Due to these structural differences, the FTC's removal protections do not raise separation of powers concerns.

Even if the removal protections of the FTC did violate the separation of powers, however, the requested remedy—invalidation of an enforcement action brought under 15 U.S.C. § 56(a)(1)—does not follow.  The Supreme Court has held where removal protections violate the separation of powers, courts must first examine whether the removal provisions are severable from the statute.  If severable, the removal provisions are invalidated and the remainder of the statute stands.  *See, e.g.*, *Seila Law*, 140 S. Ct. at 2192; *Collins*, 141 S. Ct. at 1787–88.  The FTC Act specifically requires "[i]f any provision of this subchapter, or the application thereof to any person, partnership, or corporation, or circumstance, is held invalid, the remainder of this subchapter, and the application of such provisions to any other person, partnership, corporation, or circumstance, shall not be affected thereby."  15 U.S.C. § 57.  As follows, the FTC's ability to authorize Plaintiff to bring this suit would not be affected by the constitutionality of the removal provision at

issue. *See, e.g.*, *FTC v. Kochava, Inc.*, No. 2:22-CV-00377-BLW, 2023 WL 3249809, at *12 (D. Idaho May 4, 2023).

Accordingly, Defendants' challenge to the present suit on this basis is denied.

**V.   Non-delegation Doctrine**

Atlas argues Plaintiff lacks the authority to bring this action because the non-delegation doctrine prohibits delegation of Congressional power to an administrative agency in the absence of an "intelligible principle" directing agency action and that the FTC Act and Telemarketing Act lack such an intelligible principle.  (ECF No. 45-1 at 44–45.)

Under Article I of the Constitution, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. I, § 1.  The non-delegation doctrine extends from this provision such that Congress "may not transfer to another branch powers which are strictly and exclusively legislative."  *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).  Over time, however, Congress has delegated its power to executive agencies in order to effectuate its legislative goals and principles.  This sort of "statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'"  *Id.* at 2123 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).  A delegation is permissible so long as "Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of [his] authority.'"  *Id.* at 2129 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).  This standard is "not demanding" and "[p]revailing on a non-delegation challenge is thus a tall order." *United States v. Melgar-Diaz*, 2 F.4th 1263, 1266–67 (9th Cir. 2021).

The FTC Act and Telemarketing Act contain intelligible principles to direct the FTC's action.  The FTC Act provides that the Commission has authority to declare acts or practices unlawful as "unfair" or "deceptive."  15 U.S.C. § 45(a).  The FTC Act, however, also clarifies that an act or practice cannot be deemed unfair "unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably

avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  15 U.S.C. § 45(n).  This direction is sufficient to avoid offending the Constitution.

The Telemarketing Act further provides guidance on the general policy to be pursued and the boundaries placed on the FTC in this context.  In delegating authority to the FTC to "prescribe rules prohibiting deceptive telemarketing acts or practices," Congress provided guidance in the form of particular rules to be made such as for fraudulent charitable solicitations, restrictions on unsolicited phone calls, restrictions on the hours calls are made, and disclosure requirements.  15 U.S.C. § 6102.  Congress also provided a definition of telemarketing and safe harbors for non-offensive conduct such as "sales through the mailing of a catalog." 15 U.S.C. § 6106.  This guidance provides an intelligible principle for the FTC.

Case law affirms this result.  The Supreme Court decades ago held the FTC Act's grant of authority did not offend the non-delegation doctrine.  *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 532–33 (1935). The Ninth Circuit and the Supreme Court have also held statutes with similar grants of authority do not offend the non-delegation doctrine.  *See Beecher v. Comm'r*, 481 F.3d 717, 723 (9th Cir. 2007) (denying a non-delegation challenge to a statute directing the Secretary of the Treasury to "prescribe such regulations as may be necessary or appropriate" to carry out the statutory goals); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946) (affirming the statutory delegation to modify holding company structures to ensure that are not "unduly or unnecessarily complicate[d]"); *N.Y. Cent. Secs. Corp. v. United States*, 287 U.S. 12, 24–25 (1932) (upholding the delegation of authority to the ICC to approve railway mergers so long as they are in the "public interest").

Accordingly, this grant of authority to the FTC does not violate the non-delegation doctrine.

23cv0313

## VI.   Major Questions Doctrine

Atlas argues the FTC Act and Telemarketing Act did not contemplate the regulation of ringless voicemail such that this action violates the major questions doctrine.  (ECF No. 45-1 at 45.)  The major questions doctrine requires "Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"  *Mayes v. Biden*, 67 F.4th 921, 923–33 (9th Cir. 2023) (quoting *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023).  Instances that invoke the major questions doctrine are "extraordinary cases" where "the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)).  In examining whether an agency's interpretation constitutes "an enormous and transformative expansion" of regulatory authority, courts must look to the language employed in the statute and the history of how that regulatory authority was used.  *See West Virginia*, 142 S. Ct. at 2610.

As discussed above, the Telemarketing Act and the TSR contemplated ringless voicemail in its definition of a "telephone call."  And as discussed above, the regulatory history of the TSR shows ringless voicemail was included in its scope.  Therefore, the FTC is not finding "new-found powers in old statutes."  *See N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 297 (4th Cir. 2023).

However, even if "telephone call" was ambiguous about the inclusion of ringless voicemail, the FTC's invocation of the TSR to cover ringless voicemail lacks the hallmarks of "an enormous and transformative expansion of regulatory authority."  *See West Virginia*, 142 S. Ct. at 2610.  Compared to other "extraordinary" regulations found to violate the major questions doctrine, there are only a handful of ringless voicemail providers, and the total market for ringless voicemail is small.  *See, e.g.*, *Coastal Fisheries*, 76 F.4th at 299–300 (holding an Environmental Protection Agency regulation that would impact every

commercial or recreational fisherman raised a major question); *Brown & Williamson*, 529 U.S. at 159 (holding newfound regulation of the tobacco industry was regulatory overreach).  And unlike regulations found to be major questions, the regulation of ringless voicemail also falls within the ambit of the FTC's traditional regulatory expertise.  *See West Virginia*, 142 S. Ct. at 2609.

Accordingly, this case does not present concerns under the major questions doctrine. Refreshed uses of a statute do not necessarily imply regulatory overreach or major questions.  Atlas's motion to dismiss on this basis is denied.

## VII.   Substantive Due Process and Fair Notice

Atlas advances two arguments that it did not receive fair notice that the TSR applied to its conduct.  First, Atlas argues its rights under the Due Process Clause are violated in the instant suit because the term "telephone call" is unconstitutionally vague.  (ECF No. 45-1 at 43.)  Second, Atlas argues the instant suit impermissibly expands the scope of the TSR through adjudication and that the FTC should have engaged in rulemaking to provide Atlas and similarly situated parties with fair notice and an opportunity to be heard.  (*Id.* at 25–26.)

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  This principle is violated where a law either "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).  In the context of civil statutes regulating economic activity, the standard is sufficiently low that statutes are unconstitutionally vague only where they are "so vague and indefinite as really to be no rule or standard at all."  *Boutilier v. INS*, 387 U.S. 118, 123 (1967).

Neither the FTC Act nor the TSR is unconstitutionally vague.   Courts have consistently rejected this broad challenge to the FTC's authority because Congress "explicitly considered, and rejected, the notion that it reduce the ambiguity of the phrase

'unfair methods of competition' by tying the concept of unfairness to a common-law or statutory standard or by enumerating the particular practices to which it was intended to apply." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–40 (1914).  *See FTC v. D-Link Sys., Inc.*, No. 3:17-CV-00039-JD, 2017 WL 4150873, at *4 (N.D. Cal. Sept. 19, 2017).  And in this particular context, the Telemarketing Act and the TSR have articulated sufficient standards for what constitutes telemarketing and telephone calls.  Atlas's disagreement with the FTC's interpretation of telephone calls to include ringless voicemail does not mean those definitions are impermissibly vague.

With respect to fair notice in the regulatory context, when the "violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Phelps Dodge Corp. v. Fed. Mine Safety and Health Review Comm'n*, 681 F.2d 1189, 1193 (9th Cir. 1982) (internal quotation omitted).  An agency cannot impose stricter standards in an enforcement action than are plainly specified in a promulgated regulation.  *See Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1328–32 (9th Cir. 1982).

Atlas misapprehends fair notice with respect to rulemaking.  Agencies do not need to issue general rules before performing their statutory duties.  *SEC v. Chenery Corp.*, 332 U.S. 194, 201–02 (1947).  *See also D-Link Sys.*, 2017 WL 4150873 at *4.  Requiring agencies to engage in rulemaking before bringing statutorily authorized enforcement actions would "stultify the administrative process" and render an agency "inflexible and incapable" of meeting its statutory responsibilities.  *Chenery*, 332 U.S. at 202–3.  While parties cannot be held liable for violations "not clearly applicable either by statute or by regulation," the FTC is not required to engage in rulemaking before proceeding with a statutorily authorized enforcement action.  *See United States v. Trident Seafoods Corp.*, 60 F.3d 556, 559 (9th Cir. 1995).

As discussed earlier, the FTC has adequately expressed that "telephone calls" under the TSR includes ringless voicemails.  By the plain meaning of the TSR, the structure of the TSR, the regulatory history of the TSR, and the enforcement history of the TSR,

Plaintiff has alleged Atlas and similarly situated defendants could have been on notice that ringless voicemails were regulated by the TSR.

Accordingly, Atlas's motion to dismiss for lack of due process and fair notice is denied.

**VIII.  Conclusion**

Defendant Atlas's Motion to Dismiss and Motion to Strike (ECF No. 45-1) and Defendant Ace's Motion to Dismiss (ECF No. 42-1) are **DENIED**.  Defendant Stratics's Motion to Dismiss (ECF No. 50-1) is **GRANTED**.  Plaintiff's claims against Stratics are thus dismissed with prejudice.

**IT IS SO ORDERED.**

**DATED: March 6, 2024**

Hon. Cynthia Bashant
United States District Judge

23cv0313