**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                            Plaintiff,<br><br>    v.<br><br>STRATICS NETWORKS INC., A CORPORATION, *et al.*,<br><br>                           Defendants. | Case No. 23-cv-00313-BAS-KSC<br><br>**ORDER:**<br>   **(1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 213);**<br><br>   **(2) DENYING INDIVIDUAL ATLAS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 209);**<br><br>   **(3) DENYING ACE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 197); AND**<br><br>   **(4) DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT (ECF No. 276).** |

Presently before the Court are motions for summary judgment submitted by Plaintiff United States of America (ECF No. 213), Defendants Eric Petersen and Todd DiRoberto

- 1 -

("Individual Atlas Defendants") (ECF No. 209), and Defendants Ace Business Solutions, LLC and Sandra Barnes ("Ace Defendants") (ECF No. 197).  Plaintiff has also submitted a motion for default judgment against Defendants Atlas Marketing Partners, Inc., Atlas Investment Ventures, LLC, and Tek Ventures, LLC, d/b/a Provident Solutions ( "Corporate Atlas Defendants").  (ECF No. 276.)

For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for summary judgment.  (ECF No. 213.)  However, the Court **DENIES** Individual Atlas Defendants' motion for summary judgment (ECF No. 209) and Ace Defendants' motion for summary judgment (ECF No. 197).

Further, the Court **DENIES WITHOUT PREJUDICE** Plaintiff's motion for default judgment against Corporate Atlas Defendants regarding the exact amount of damages.  (ECF No. 276.)  However, the Court **VACATES AS MOOT** Plaintiff's motion for default judgment regarding Corporate Atlas Defendants' liability and request for consumer redress, civil penalties, and injunctive relief.  (*Id*.)

## I.    BACKGROUND

Individual Atlas Defendants are co-owners of three interconnected companies: Atlas Investment Ventures LLC, Atlas Marketing Partners, Inc., and Tek Ventures, LLC ("Corporate Atlas Defendants").

The Individual and Corporate Atlas Defendants (collectively, "Atlas Defendants") ran a scheme ("Provident Solutions Program") to sell their services to debt-ridden consumers—including by placing prerecorded voicemails ("RVMs") on phone numbers listed on the national Do Not Call Registry and by direct mail marketing.  (ECF Nos. 213-1 at 1, 5, 7–8; 213-4, Ex. 33; 213-5, Exs. 120, 135.)  The Provident Solutions Program involved sending debt validation letters on behalf of consumers, but did not consolidate, settle, or negotiate debt on behalf of consumers.  (ECF No. 257 at 4:17–26.)  In their representations to consumers, Atlas Defendants stated their services are aimed at reducing the consumers' debt.  (*See, e.g.,* ECF No. 213-4, Exs. 30–31, 36–47.)

Ace Business Solutions, LLC ("Ace") and Sandra Barnes ("Barnes") (collectively, "Ace Defendants") played a role in Atlas Defendants' scheme by conducting "Quality Control" and retention calls with Atlas Defendants' consumers who had signed a Provident Solutions Program enrollment agreement, by processing Atlas Defendants' consumers' payments, and by sending debt validation letters to creditors on behalf of Atlas Defendants' consumers. (*See* ECF Nos. 213-3 at Exs. 4, 10, 11, 13, 17, 18; 213-5, Exs. 85–87.)

On February 16, 2023, Plaintiff filed a complaint against Defendants[1] asserting the following causes of action:

1. Count I (Atlas Defendants): Misrepresentations Regarding Debt Relief Service, 15 U.S.C. § 45(a) (ECF No. 1 ¶¶ 127–130);

2. Count III (Atlas Defendants): Initiating Unlawful Prerecorded Messages, Section 310.4(b)(1)(v)(A) of the TSR(ECF No. 1 ¶¶ 134–136);

3. Count IV (Atlas Defendants): Failure to Make Required Oral Disclosure, Section 310.4(d)(1) of the TSR (ECF No. 1 ¶¶ 137–139);

4. Count V (Atlas Defendants): Misrepresentations of Material Aspects of a Debt Relief Service (ECF No. 1 ¶¶ 140–142); and

5. Count VI (Ace Defendants): Charging or Receiving a Fee in Advance of Providing a Debt Relief Service, 16 C.F.R. § 310.4(a)(5)(i) (ECF No. 1 ¶¶ 143–145).

Plaintiff filed the operative motion for summary judgment against Atlas Defendants on Counts I, III, IV, V, and against Ace Defendants on Count VI and seeking damages and injunctive relief. (ECF No. 213.) Ace Defendants filed a motion in opposition to Plaintiff's motion for summary judgment. (ECF No. 230.) Atlas Defendants also filed a motion in

---

[1] Plaintiff's claims against Defendants Kasm, Inc. and Kenan Azzeh have been terminated. (ECF No. 4.) In addition, Plaintiff's claims against Defendant Stratics Networks Inc. have been dismissed. (ECF No. 71.)

opposition to Plaintiff's motion for summary judgment.  (ECF No. 239.)  Plaintiff replied to Atlas Defendants (ECF No. 247) and Ace Defendants (ECF No. 248).

Individual Atlas Defendants moved for summary judgment on Counts I, III, IV, and V on grounds that: (1) Individual Atlas Defendants are not individually liable, (2) Individual Atlas Defendants did not receive fair notice under the Telemarketing Sales Rule, 16 C.F.R. §§ 310 *et seq*. ("TSR"), (3) Individual Atlas Defendants are not subject to civil penalties and injunctive relief; and (4) the relevant statute of limitations for violations of the TSR commences after February 16, 2020.  (ECF No. 209.)  Plaintiff responded.  (ECF No. 235.)  Individual Atlas Defendants replied.  (ECF No. 249.)

Ace Business Solutions, LLC and Sandra Barnes moved for summary judgment on Count VI on grounds that: (1) Ace Defendants are not "sellers" under the TSR, (2) Ace Defendants are not "telemarketers" under the TSR, and (3) Ace Defendants do not offer "debt relief services" defined by the TSR.  (ECF No. 197.)  Plaintiff filed a response in opposition.  (ECF No. 232.)  Ace Defendants filed a reply (ECF No. 243), then later filed a corrected reply brief (ECF No. 252).

## II.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an

23cv313

essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id*. at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A party opposing a motion for summary judgment must set forth specific material facts showing a "genuine dispute" as to a "material fact." *See* Fed. R. Civ. P. 56(a), (c)(1). If the moving party meets the initial burden of establishing the absence of material fact, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing *Anderson*, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient"). Rather, the nonmoving party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

At the summary judgment stage, the Court may reasonably consider the evidence presented by the parties and determine the extent to which it is relevant. It need not take judicial notice in order to consider the documents. *See Am. Bankers Ins. Co. of Fla. v. Nat'l Fire Ins. Co. of Hartford*, 488 F. Supp. 3d 892, 896 (N.D. Cal. 2020).

## III.   ANALYSIS

- 5 -

## A.    Atlas Defendants

Plaintiff moves for summary judgment against Atlas Defendants on Counts I, III, IV, and V; and for civil penalties, consumer redress, and injunctive relief.  (ECF No. 213.) Individual Atlas Defendants move for summary judgment on those counts on bases that: (1) they are not individually liable and (2) they were not provided constitutionally fair notice that "calls" under the TSR included RVMs, and thus, they are not subject to civil penalties or injunctive relief.  (ECF No. 209.)

### 1.    Count I (Atlas Defendants): Misrepresentations Regarding Debt Relief Service, 15 U.S.C. § 45(a)(1)

Section 5 of the FTC Act prohibits "deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  An act or practice is deceptive (1) if it is likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material. *F.T.C. v. Cyberspace.com*, 453 F.3d 1196, 1199–1200 (9th Cir. 2006).  A representation is "likely to mislead consumers" when (1) the representation is false; or (2) the advertiser lacked a reasonable basis for its claims.  *F.T.C. v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012) (citation modified).  Material misrepresentations involve information important to consumers and thus "likely to affect their choice of, or conduct regarding, a product."  *Cyberspace.com*, 453 F.3d at 1201.  Express claims are presumed material.  *See F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994).  Courts also consider "the overall 'net impression' that defendants' representations make upon consumers."  *Cyberspace.com*, 453 F.3d at 1200; *F.T.C. v. Elegant Sols., Inc.*, 2020 WL 4390381, at *8 (C.D. Cal. July 6, 2020), *aff'd*, 2022 WL 2072735 (9th Cir. June 9, 2022).

The Court finds Plaintiff has met its initial burden to move for summary judgment that Atlas Defendants made false and misleading statements to customers in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1)—which prohibits "deceptive acts or practices in or affecting commerce."  (ECF No. 213-1 at 26:22–30:4.)

23cv313

Plaintiff presents the following categories of misrepresentations made by Atlas Defendants:

1. **Consumers enrolled in the Provident Program can become debt free in a certain period of time (often between 12 and 36 months)** (*See, e.g.,* ECF No. 213-4, Exs. 36 and 37 (Atlas Defendants' websites, such as CreditReliefUSA.com, stating consumers could "resolve debt in as little as 12-36 months"); ECF No. 191-2, Ex. 2 at 10 ("Credit Card Assistance Program" mailers claimed consumers would "Become Debt Free in 12-36 Months."); ECF No. 213-4, Exs. 29, 30, and 31 (ringless voicemail scripts offering "affordable repayment options to get [consumers] out of debt in 24 months or less"); ECF No. 213-4, Ex. 50 (live sales-call scripts stating, "we feel we should be able to lower your payments . . . and even have your balances resolved within 24-36 months"); ECF No. 213-4, Ex. 61 (Provident Solutions email to consumer stating, "you would be completely out of debt in 21 months.")

2. **Enrollment in the Provident Program will result in an "immediate reduction in payments"** (*See, e.g.*, ECF No. 191-3, Ex. 2 at 10 (physical mailers advertising that there would be an "immediate reduction of payments"); ECF No. 213-4, Ex. 36 (Consumer Services webpage representing Atlas' services will "immediately reduce payments"); ECF No. 213-4, Ex. 37 (Atlas advertised Credit Relief USA as an "alternative" to "making minimum payments . . ." on credit card debt . . . The site further claimed consumers would see an "immediate reduction of payments").)

3. **Atlas provides debt settlement, invalidation, or consolidation services** (*See, e.g.*, ECF No. 213-4, Exs. 36 (Consumer Services webpage offered "Debt settlement," "Debt Invalidation," "Debt Consolidation," and "Bankruptcy" under a banner reading "How We Can Help" and offered to "help to settle your debts quickly, putting you on monthly payment programs to help eliminate your debt much faster"), Exs. 55, 56, 57; ECF No. 213-5, Ex. 74 (consumer complaints

- 7 -

23cv313

stating Provident Solutions told consumers they could "consolidate" or "settle" their debt.)

Given that express claims are presumed material, the Court finds all of the above categories of statements are material to consumer purchasing decisions. *Pantron I Corp.*, 33 F.3d at 1096; *Cyberspace.com*, 453 F.3d at 1201.

The first two categories of statements as to the timeline and success rate of debt reduction (*i.e.*, debt free in 12 to 36 months and an "immediate reduction in payments" for consumers) must have "some recognizable substantiation for the representation prior to making it in an advertisement" under Section 5 of the FTC Act. *F.T.C. v. Johnson*, 96 F. Supp. 3d 1110, 1150 (D. Nev. 2015) (quoting *F.T.C. v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012)); *see also F.T.C. v. Am. Home Servicing Ctr., LLC*, No. 818CV00597JLSKES, 2019 WL 7171733, at *6 (C.D. Cal. Dec. 5, 2019) (defendants marketing higher success rates on their sale mortgage assistance relief services than their actual rate of success in securing loan modifications—99% as opposed to less than 50%—constitutes false and misleading statements within the meaning of the FTC Act).

Atlas Defendants do not have "recognizable substantiation" for their misrepresentations that consumers could expect debt relief results in a certain period of time. While representing Atlas Defendants as a Federal Rule of Civil Procedure 30(b)(6) deponent, Petersen testified getting through the program could "take anywhere from two to four, even five years" (ECF No. 213-3, Ex. 4 at 117:2–11). When testifying in his personal capacity, Petersen stated he was "not aware of any customers' outcomes one way or another" when asked if he was "aware of any customers who became debt free in 24 to 36 months through document preparation" (ECF No. 213-3, Ex. 14 at 198:2–6); it is not "realistic" for a consumer to become debt-free in 28 months (ECF No. 213-3, Ex. 10 at 115:9–17); and it was "unlikely" the program could resolve debt in 12 to 36 months (ECF No. 213-3, Ex. 14 at 219:1–5).

- 8 -

Rather than reducing consumers' debt payments, Atlas Defendants had imposed additional payments upon consumers for their services. Petersen testified:

> Q. In what way would a—as of 2021, in what way would a customer being enrolled have an immediate reduction of their payments?
> A. THE WITNESS [Petersen]: Well, if their payment was $600 bucks on their credit card [for that month], and the [monthly] payment to the program was $400, that would be a reduction in what they're paying [because $400 is less than $600]. But that's only if they weren't paying their credit cards in the first place.

(ECF No. 213-3, Ex. 14 at 222:18–223:3); *see also* ECF No. 213-3, Ex. 13 (Bachert Deposition confirming he is "unaware of any program offered by Atlas that would result in immediate reduction of payments").

Further, it is undisputed that, despite representing the Provident Solutions Program offered debt settlement, invalidation, or consolidation services, Atlas Defendants did not indeed offer such services. Petersen testified Atlas did not offer debt settlement or debt consolidation services. (*See, e.g.*, ECF No. 213-3, Ex. 10 at 109:12–110:10 (FTC investigation testimony in which Petersen testified provider agreement stating it "does not engage debt relief services")). Nathan Bachert, Atlas Defendants' sale manager, has confirmed the debt validation letters sent by Atlas Defendants do not seek to consolidate or settle debt, and marketing Provident Solutions as such is misleading. (*See* ECF No. 213-3, Ex. 13 at 130:10–131:24, 132:20–133:3.) Moreover, consumer complaints indicate consumers signed up for Provident Solutions' Services expecting to reduce their debts based on promises of debt consolidation services—but their payments to Provident Solutions did not result in payments to their creditors. (*See* ECF No. 213-5, Exs. 79, 89 (customer complaints stating that they signed up for Provident Solutions services after receiving mailers titled "Debt Consolidation," and despite paying Provident Solutions thousands of dollars over several months, none of customers' money has been paid to their creditors).)

Even though Atlas Defendants claim they provided notice to consumers they did not provide debt settlement, invalidation, or consolidation services in a Provident Solutions Agreement and quality control calls prior to consumers' enrollment, those disclosures were

given after the initial sales pitch in the physical mailers, website, or RVMs.  (ECF No. 239 at 9:3–9, 16:15–17.)  Therefore, such disclosures are "inadequate to cure misleading initial impressions consumers would reasonabl[y] take away about Defendants' services." *F.T.C. v. Elegant Sols., Inc.*, No. SACV191333JVSKESX, 2020 WL 4390381, at *10 (C.D. Cal. July 6, 2020), *aff'd*, No. 20-55766, 2022 WL 2072735 (9th Cir. June 9, 2022) (telemarketers' misleading representations about the quality and efficacy of student loan management services offered were not qualified by disclosures in written materials later provided).  "[M]isleading impressions [can be] compounded by the fact that some telemarketers would deviate from the scripts they were provided."  *Id.* (citing *Cyberspace.com*, 453 F.3d at 1200).

Atlas Defendants also argue they had relied upon attorney advice in marketing their services, and thus, did not intend to mislead consumers.  (ECF No. 239 at 20:17–21:11.) However, as a matter of law, Atlas Defendants' reliance upon attorney advice in creating marketing materials does not affect whether those materials are actionable as misleading under Section 5 of the FTC Act.  *Cyberspace.com LLC*, 453 F.3d 1196, 1202 (9th Cir. 2006) (citing *Feil v. FTC,* 285 F.2d 879, 896 (9th Cir. 1960)) (whether an individual acts in good or bad faith is immaterial to liability under Section 5 of the FTC Act).

For the reasons above, Atlas Defendants fail to establish any genuine issues of material fact exist that they made material misrepresentations that were likely to deceive consumers.  *See Elegant Sols., Inc.*, 2020 WL 4390381, at *10 (C.D. Cal. July 6, 2020) (finding the same).

Accordingly, the Court **GRANTS** Plaintiff's motion for summary judgment on Count I, for Atlas Defendants' violations of Section 5 of the FTC Act.

**2.    Count V (Atlas Defendants): Misrepresentations of Material Aspects of a Debt Relief Service, TSR, 16 C.F.R. § 310.3(a)(2)(x)**

Section 310.3(a)(2)(x) of the TSR prohibits misrepresentations by "seller[s]" or "telemarketer[s]" as to:

23cv313

> Any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service; the amount of time necessary to achieve the represented results . . . the effect of the service on a customer's creditworthiness; the effect of the service on collection efforts of the customer's creditors or debt collectors; the percentage or number of customers who attain the represented results.

"Debt relief service" is defined by the Section 310.2(o) of the TSR as:

> Any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.

This definition is made in "broad terms." *CFPB v. IrvineWebWorks, Inc.*, 2016 WL 1056662, at *6 (C.D. Cal. Feb. 5, 2016). "Regardless of whether it actually alters or settles the debt, a provider is liable under the TSR if it represents its services as altering or settling a debt." *United States v. Stratics Networks Inc.*, 721 F. Supp. 3d 1080, 1097 (S.D. Cal. 2024) (citing *FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067, 1082–83 (N.D. Cal. 2018)).

Plaintiff met its initial burden to move for summary judgment on Count V by presenting evidence that Atlas Defendants had misrepresented material aspects of their debt relief service in their RVMs and live calls with customers.

As a threshold matter, Atlas Defendants qualify as "seller[s]" since they, "in connection with a telemarketing transaction, provide[], offer[] to provide, or arrange[] for others to provide goods or services [*i.e.*, debt validation letters] to the customer in exchange for consideration [*i.e.*, monthly payments]." *See* 16 C.F.R. § 310.2. Moreover, the Provident Solutions Program—run by Atlas Defendants—clearly qualifies as a "debt relief service" since the RVMs represent the Program "renegotiate[s], settle[s], or . . . alter[s] the terms of payment or other terms of the debt." 16 C.F.R. § 310.2(o); *Stratics*, 721 F. Supp. 3d at 1097.

Examples of Atlas Defendants' misrepresentations in their RVMs include:

1. ECF No. 213-4, Exs. 29, 30, and 31 (RVM scripts offering "affordable repayment options to get [consumers] out of debt in 24 months or less");

2. ECF No. 213-4, Ex. 50 (live sales-call scripts stating, "we feel we should be able to lower your payments . . . and even have your balances resolved within 24-36 months");

3. ECF No. 213-4, Ex. 53 (Atlas's representatives "told consumers they could 'settle', 'pay off', 'reduce' or 'consolidate' their debt");

4. ECF No. 213-4, Ex. 54 (Consumer complaint: "I received a telephone call that explained that my bills would be reduced to lower interest and possibly settled without paying the full amount");

5. ECF No. 213-4, Ex. 55 (Consumer complaint: "I was contacted by this company to assist with debt consolidation... I was with the understanding this company would pay off my debt to the creditors");

6. ECF No. 213-4, Ex. 56 (Consumer complaint: "I was told my 24,000 in debt was talked down and settled to around 10,000. All I would have to do is make monthly payments to them and they would disperse the payments");

7. ECF No. 213-4, Ex. 57 (Consumer complaint: the representative "stated that they were a debt consolidation company and that the funds that I give are for fees as well as to pay on my debt");

8. ECF No. 213-4, Ex. 32 (RVM script stating the caller wanted to discuss "consolidation or repayment options");

9. ECF No. 213-4, Exs. 38, 39 (Nov. 2017), 40 (Apr. 2018), 41 (Nov. 2018), 42 (May 2019), 43 (Oct. 2019), and 44 (Jan. 2020) (Inbound script (for consumers calling back after an RVM): "My name is _____ with Consumer Services... the purpose of this call is simply to see if you are

23cv313

eligible for any of the payment reduction programs regarding your credit card balances");

10. ECF No. 197-2, Ex. 16 at 179 (Consumer declaration stating Provident salesman told her Provident would "consolidate [her] debt so that instead of making multiple monthly payments to my creditors [she] could make one monthly payment to Provident" and would "negotiate to lower [her] credit card balances or eliminate [her] credit card debt altogether"); and

11. ECF No. 197-2, Ex. 18 at 187 (Consumer declaration stating: "The Provident representative told me they would negotiate with my creditors and that I would only have to pay approximately twenty (20) percent of my outstanding debt to each of my creditors").

Based on the same evidence discussed *supra* § III.A.1, Atlas Defendants' representations as to their services mislead consumers on "material aspects"—including "the effect of the service on collection efforts of the customer's creditors or debt collectors." *See* 16 C.F.R. § 310.3(a)(2)(x). It is undisputed that—despite representing otherwise—Atlas Defendants do *not* provide debt settlement or consolidation services. Further, Atlas Defendants' representations about the amount of time necessary to achieve the represented results (*i.e.*, 12 to 36 months) and the amount of money or the percentage of debt amount that a customer may save by using Provident Solutions Service (*i.e.*, becoming debt free or reducing debt by a certain amount by making monthly payments to Provident Solutions Program for their document preparation services) are contradicted by their own testimony and consumer complaints. *Supra* § III.A.1.

Atlas Defendants oppose Plaintiff's request for summary judgment on Count V primarily on grounds that they did not "intentionally misrepresent Provident's document preparation services." (ECF No. 239 at 23:21–24:8.) However, under the plain meaning, a seller makes a misrepresentation prohibited by 16 C.F.R. § 310.3(a) by the <u>act</u> of "[m]isrepresenting, directly or by implication, in the sale of goods or services . . . material information," without an express limitation on the degree of connection between the action

- 13 -

and the violation, and without regard to motive or intent. *Cf. United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952, 958 (C.D. Ill. 2009) (finding intent is not necessary to establish a violation of 16 C.F.R. § 310.4(b)—which similarly does not have any stated *mens rea* requirement—through a comparison to 16 C.F.R. § 310.3(b)—which prohibits deceptive acts by a person providing "substantial assistance or support to any seller or telemarketer . . . that the person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates the TSR").

Since the mere act of misrepresentation is sufficient for Atlas Defendants' liability under 16 C.F.R. § 310.3(b), the Court **GRANTS** Plaintiff's motion for summary judgment on Count V.  (ECF No. 213.)

### 3.    Count III (Atlas Defendants): Initiating Unlawful Prerecorded Messages, 16 C.F.R. § 310.4(b)(1)(v)(A)

Section 310.4(b)(1)(v) of the TSR prohibits sellers and telemarketers from initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the seller has obtained the call recipient's express agreement to the delivery of the message.

"[T]elephone call" under the TSR includes ringless voicemails. *See F.T.C. v. Cardiff*, No. ED-CV-18-12104-DMG-PLAX, 2020 WL 6540509, at *17 (C.D. Cal. Oct. 9, 2020) (granting summary judgment that the TSR was violated by  sending "prerecorded ringless voicemails" without an express agreement to "the placement of such calls"); *Stratics*, 721 F. Supp. 3d 1080, 1096 (S.D. Cal. 2024) (finding the same).

More specifically, the workflow for Atlas Defendants leaving RVMs is as follows:

1. **Step 1 — Acquire targeted leads**. Atlas Defendants bought "leads" from a "lead aggregator," specifically targeting financially vulnerable consumers with high debt—those "at least $7,500 in debt." (ECF No. 213-3, Exs. 12 at 65:13–19, 66:17–21, 14 at 245:3–20, and 4 at 211:1–212:5.)

2. **Step 2 — Draft and approve a script**. The RVMs followed scripts created by Atlas Defendants' marketing contractors, with Individual Atlas Defendants

- 14 -

23cv313

having final approval over their content. (ECF No. 213-3, Exs. 12 at 85:7–18, 94:6–95:3, 96:16–97:8; ECF No. 213-4, Exs. 29, 30.)  The scripts directed the caller to use an alias rather than identify themselves as calling on behalf of Atlas Defendants, and contained the debt-relief pitch ("affordable repayment options to get you out of debt in 24 months or less," "lower your monthly payments," "consolidation or repayment options").  (ECF No. 213-4, Exs. 29, 30, 31, 32; ECF No. 213-3, Ex. 12 at 85:19–86:3.)

3. **Step 3 — Record and upload the message**.  Atlas recorded the prerecorded voicemail message.  (ECF No. 213-4, Ex. 27 at 48:13–20.)

4. **Step 4 — Log into the Stratics platform and complete the compliance certification**.  Atlas distributed the RVMs through a platform operated by former defendant Stratics Networks, Inc.  (ECF No. 213-4, Ex. 27 at 48:13–20.) DiRoberto was personally involved in setting up Atlas Defendants' Stratics account. (ECF No. 213-4, Ex. 26 at 137:21–24.) Each time an agent or employee of Atlas Defendants signed into the Stratics account, they had to complete Stratics' "Mandatory 18 Point User Compliance Interactive Process" (ECF No. 213-4, Ex. 26 at 137:1–16; ECF No. 213-4, Ex. 28 at 350), which required Atlas to certify that "[w]here required by applicable law or regulation, you will obtain the prior written consent from each recipient to contact each recipient."  (ECF No. 213-4, Exs. 26 at 143:18–144:2, 28 at 6.)

5. **Step 5 — Blast the message to the lead list nationwide**. Through Stratics, the prerecorded message was delivered "directly to [the recipient's] voicemail" without the phone ringing—though "in some instances RVMs cause a partial ring (a line 'tap' or 'ping')."  (ECF No. 213-4, Exs. 27 at 48:13–20, 13 at 191:11–23, 28 at 350.)  Delivery went to consumers nationwide (*e.g.*, recipients in Minnesota and Pennsylvania).  (ECF No. 213-4, Exs. 33 at 362, 34.)  The volume was one to two million RVMs per week from September 12, 2019 to November 20, 2020. (ECF No. 213-4, Ex. 26 at 106:2–6.)  Atlas repeatedly certified it would obtain

- 15 -

prior written consent "where required," yet the record shows that Atlas "had no prior established express or business relationship with these consumers and did not attempt to obtain their consent." (ECF No. 213-4, Ex. 26 at 85:20–86:6; ECF No. 213-3, Ex. 4 at 209:2–15.)

6. **Step 6 — Capture inbound responses and route to the sales pitch**. Consumers who called Atlas's phone line in response to the RVM reached live representatives working from inbound scripts that carried the same debt-relief representations, beginning the enrollment/sales process. (ECF No. 213-4, Exs. 38, 39 (Nov. 2017 script), 40 (Apr. 2018 script), 41 (Nov. 2018 script), 42 (May 2019 script), 43 (Oct. 2019 script), and 44 (Jan. 2020 script).)

Atlas Defendants do not contest that RVMs were left without prior written consent or established business relationship with call recipients, in violation of the plain text of Section 310.4(b)(1)(v)(A) of the TSR. (ECF No. 239 at 21:13–15.) Instead, Atlas Defendants argue it was not clear to them at the time the RVMs were placed that they were included in the scope of Section 310.4(b)(1)(v)(A) of the TSR and Section 310.4(b)(1)(v)(A) violations are committed by other actors. (ECF No. 239 at 21:12–23:2.)

More specifically, Atlas Defendants claim they did not intentionally violate the TSR by using RVMs, since the TSR text is ambiguous and Atlas Defendants relied upon attorney representations that RVMs were not covered by the TSR at the time RVMs were placed. (*Id*. at 18:6–22:20; *see also* ECF No. 213-5, Ex. 103 (letter from Atlas Defendants' law firm analyzing whether RVMs are covered by the Telephone Communications Protection Act and FTC regulations and finding "neither the FCC, or FTC to our knowledge has targeted a user of RVM technology by alleging a TCPA violation.")

However, the Court agrees with Plaintiff that, Section 310.4(b)(1)(v)(A) of the TSR does not provide any *mens rea* standard in its text. *See, e.g., Feil v. F.T.C.,* 285 F.2d 879, 896 (9th Cir. 1960) (whether an individual acts in good or bad faith is immaterial to liability

23cv313

under FTCA § 5 where there is a likelihood to deceive); *Dish Network, L.L.C.*, 667 F. Supp. 2d at 958 (C.D. Ill. 2009) (intent is not necessary to establish a violation of 16 C.F.R. § 310.4(b)); *F.T.C. v. John Beck Amazing Profits, LLC*, No. 2:09-CV-4719-FMC-FFM, 2009 WL 7844076, at *13 (C.D. Cal. Nov. 17, 2009) (not considering mental state when finding defendants' telemarketers are in violation of Section 310.4(b)(1)(iii)(A) of the TSR, which like Section 310.4(b)(1)(v)(A) of the TSR also does not contain an explicit *mens rea* standard); *see also Cyberspace.com LLC*, 453 F.3d at 1202 ("[R]eliance on advice of counsel [is] not a valid defense on the question of knowledge" required for individual liability).

Relatedly, Atlas Defendants' mistake-of-law defense fails since they do not demonstrate they were "unaware" of the relevant federal prohibition at issue here (*i.e.*, Section 310.4(b)(1)(v)(A)) of the TSR or that it "would not be reasonable [to] have known its conduct was unlawful." *See Stratics*, 721 F. Supp. 3d at 1100 (quoting *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583–84 (2010)).

Though Atlas Defendants' counsel represented RVMs could be lawful under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), that is unrelated to whether Atlas Defendants relied upon misinformation that RVMs are lawful under the TSR. (*See* ECF No. 213-5, Ex. 103.)

In opposing Plaintiff's motion for summary judgment, Atlas Defendants point out *F.T.C. v. Cardiff*, No. ED-CV-18-12104-DMG-PLAX, 2020 WL 6540509, at *17 (C.D. Cal. Oct. 9, 2020)—holding that RVMs constitute prerecorded messages actionable under Section 310.4(b)(1)(v)(A) of the TSR—was decided near when Atlas Defendants stopped using RVMs. (ECF No. 239 at 21:13–22:3, 22:21–26.) However, *Cardiff* is only one decision amongst other authority from which Atlas Defendants could have inferred RVMs were covered at the time of their Section 310.4(b)(1)(v)(A) of the TSR violation. *Stratics*, 721 F. Supp. 3d at 1095–96 (this Court's prior Order discussing the plain meaning of the statute and the regulatory history).

Moreover, Individual Atlas Defendants move for summary judgment on the basis that they were not provided constitutionally fair notice RVMs constituted "calls" under the TSR (ECF No. 209 at 19:10–20:23). Thus, Individual Atlas Defendants assert the government cannot constitutionally enforce Count III. (*Id*. at 15:24–27.) As this Court held in its prior decision on Atlas Defendants' motion to dismiss, *Stratics*, 721 F. Supp. 3d at 1112, "[n]either the FTC Act nor the TSR is unconstitutionally vague . . . in this particular context, the Telemarketing Act and the TSR have articulated sufficient standards for what constitutes telemarketing and telephone calls." Courts have consistently rejected this broad challenge to the FTC's authority because Congress "explicitly considered, and rejected, the notion that it reduce the ambiguity of the phrase 'unfair methods of competition' by tying the concept of unfairness to a common-law or statutory standard or by enumerating the particular practices to which it was intended to apply." *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–40 (1972); *see also F.T.C. v. D-Link Sys., Inc.*, No. 3:17-CV-00039-JD, 2017 WL 4150873, at *4 (N.D. Cal. Sept. 19, 2017).

Finding Atlas Defendants have failed to raise triable issues as to Plaintiff's Count III claims, the Court **GRANTS** Plaintiff's motion for summary judgment on Count III. Additionally, finding Atlas Defendants have failed to meet their initial burden, the Court **DENIES** Atlas Defendants' motion for summary judgment on Count III.

### 4. Count IV (Atlas Defendants): Failure to Make Required Oral Disclosure, 16 C.F.R. § 310.4(d)(1)

Under Section 310.4(d)(1) of the TSR, telemarketers must orally disclose "truthfully, promptly, and in a clear and conspicuous manner" the "identity of the seller."

Plaintiff met its initial burden to move for summary judgment on Count IV by presenting evidence the RVMs do not identify any of the Atlas entities by name—or otherwise reveal Atlas Defendants' identity. *United States v. Corps. for Character, L.C.*, 116 F. Supp. 3d 1258, 1278 (D. Utah 2015) ("Kids First is not a trade name, but a certification mark of the Coalition for Quality . . . Because Defendants failed to disclose

- 18 -

23cv313

the seller's name, the court grants summary judgment for the FTC [on its Section 310.4(d)(1) of the TSR claim]").

RVMs either identified the caller as a representative of "Consumer Services," or did not identify the speaker at all. (*See, e.g.,* ECF No. 213-4, Exs. 29, 30 (RVM scripts directing the caller to use a made up name); ECF No. 213-3, Ex. 12 at 85:19–86:3 (deposition testimony confirming the alias instruction).) Some RVM scripts also direct callers to use a firm alias of "Consumer Services" instead of identifying as calling on behalf of Atlas. (ECF No. 213-4, Exs. 39, 40.) Atlas' call scripts also instruct sales representatives to identify themselves as employees of Credit Relief USA or Consumer Services. (*See, e.g.,* ECF No. 213-4, Exs. 38, 39 (Nov. 2017), 40 (Apr. 2018), 41 (Nov. 2018), 42 (May 2019), 43 (Oct. 2019), and 44 (Jan. 2020) (Inbound script (for consumers calling back after an RVM): "My name is _____ with Consumer Services... the purpose of this call is simply to see if you are eligible for any of the payment reduction programs regarding your credit card balances"); ECF No. 213-3, Ex. 14 (May 6, 2025 Petersen Deposition) (sales representatives identified themselves as employees of "Consumer Services" or "Credit Relief USA").) "Consumer Services" and "Credit Relief USA" are not Corporate Atlas Defendants' legal names; and do not exist as separate legal identities. (ECF No. 213-3, Ex. 4 (Petersen 30(b)(6) Testimony on behalf of Atlas) at 223:5–16 (Credit Relief USA was just "a website" among "about 500 other random URLs").) Petersen even admitted that Atlas Defendants used the aliases because it "preferred that consumers . . . not associate" the calls with the company, describing the practice as "kind of a buffer to . . . not taint the actual business." (ECF No. 213-3, Ex. 10 (April 30, 2021 Petersen F.T.C. Investigation Testimony re Atlas) at 61:2–25, 61:17–21.)

Atlas Defendants respond that "[e]ven if the specific corporate entity was not always named in the initial contact, it was clearly disclosed by the end of the conversation through the Provident Solutions Agreement and quality control call." (ECF No. 239 at 23:17–19.) However, Section 310.4(d) of the TSR requires that these disclosures be made "promptly" and "in an outbound telephone call." Construing Section 310.4(d)(1) of the TSR to permit

23cv313

late disclosure *after* consumers have already agreed would defeat the purpose of the regulation to expand consumers' decision-making regarding whether to purchase Atlas Defendants' products in the first place. *See Corps. for Character, L.C.*, 116 F. Supp. 3d at 1278 ("[Section 310.4(d)(1) of the TSR] allows consumers to judge whether to listen to the message and purchase the product and also gives consumers information so they can contact the seller to prevent future calls.").

Here, consumers are exposed to the Provident Solutions Agreement and quality control call in separate conversations only *after* consumers have already agreed to initiate enrolling in Atlas Defendants' service. (*See, e.g.*, ECF No. 213-3, Exs. 10 at 96:4–12 (Petersen's April 30, 2021 FTC Investigation testimony confirming that following Atlas's sales pitch, consumers must complete a recorded QC Call before their enrollment in the Provident Program is complete), 17 at 151:9–11 (Barnes' testimony confirming the same), 167:5–21 ("Once the consumer agrees to enroll in the Provident Program, the Atlas sales representative and the consumer sign the Provident Program Agreement . . .").) Thus, Atlas Defendants have failed to raise triable issues on Count IV.

For the reasons above, the Court **GRANTS** Plaintiff's motion for summary judgment on Count IV, for Atlas Defendants' violations of Section 310.4(d)(1) of the TSR.

### 5.   Counts I, III, IV, and V: Corporate Atlas Defendants' Common Enterprise

The Ninth Circuit has held "[w]here corporate entities operate together as a common enterprise, each may be held liable for the deceptive acts and practices of the others." *F.T.C. v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014). A common enterprise exists and can be held jointly liable for violations of the FTC Act when there are "strongly interdependent economic interests" among the companies and "all of the companies were beneficiaries of and participants in a shared business scheme." *F.T.C. v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010).

When determining common enterprise liability, courts look to four factors: "(1) common control; (2) sharing office space and offices; (3) whether business is transacted

- 20 -

23cv313

through a 'maze of interrelated companies'; and (4) commingling of funds." *F.T.C. v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012); *see also Int'l Bhd. of Elec. Workers Loc. 449 v. Black Ridge Energy Servs., Inc.*, No. 4:13-CV-00355-EJL, 2015 WL 1119490, at *4 (D. Idaho Mar. 11, 2015) (common enterprise liability where "two entities used the same premises/offices, phone, employees, and equipment which go to show they had interrelated operations."). In addition, "sufficient interconnections to constitute an enterprise may be based on similar or related business purposes among members, shared assets and overlapping corporate officers and personnel." *See also Jane Doe I v. Reddy*, No. C 02-05570 WHA, 2003 WL 23893010, at *3 (N.D. Cal. Aug. 4, 2003) (citing *United States v. Feldman,* 853 F.2d 648, 655–56 (9th Cir. 1988)).

Plaintiff moves for summary judgment on grounds that the Individual Atlas Defendants operated the Corporate Atlas Defendants as a common enterprise, "making them jointly and severally liable under the FTC Act and the TSR." (ECF No. 213-1 at 33:15-16.) The joint undisputed statement of material facts states Individual Atlas Defendants were co-founders and co-owners of Corporate Atlas Defendants and they have "exclusive 'actual, implied, [and] de facto authority to control' [Corporate Atlas Defendants]." (ECF No. 257 at 2:7–15.) Additionally, Plaintiff presents evidence that the Corporate Atlas Defendants share an office space in San Diego. (*See* ECF No. 78 at ¶¶ 11–13 (Atlas Defendants' Answer); ECF No. 213-3, Ex. 4 at 40 at 66:7–14.) Further, Plaintiff presents evidence Corporate Atlas Defendants were "interrelated" since they "operate in the same business of marketing debt relief services and us[e] the same employees." (*See* ECF No. 213-1; *see also* ECF No. 213-3, Ex. 2 at 11:21–22 (All employees of all three Atlas Entities were employed and paid through Atlas Investment)); ECF No. 213-3, Ex. 3 at 11:23–26 (interrogatory response stating that each Corporate Atlas Defendant "offered services that were the same or substantially similar in nature").

Plaintiff also presents evidence business is transacted through a "maze of interrelated companies." (*See* ECF No. 213-3, Ex. 4 at 39:22–23 (Petersen deposition transcript stating Atlas Marketing Partners and Atlas Investment Ventures "ran so close and similar to each

other that sometimes distinguishing one or the other can get blurred").) For example, consumers calling in response to one of Provident's marketing advertisements would be connected to an individual employed by Atlas Investment; and Atlas Investment employees communicated with consumers regarding enrollment in the Provident Program. (ECF No. 257 at 2:22–24; ECF No. 198-1, Exs. 3 at 272:12–21 (May 6, 2025 Petersen Deposition Transcript), 5 at 17:19–18:7 (May 8, 2025 Nathan Bachert Deposition Transcript)); ECF No. 235-2, Ex. 153 at 1 (An email chain between Petersen, DiRoberto, and Bachert titled "2020 "roadmap" showing interrelations between Corporate Atlas Defendants, for example: Atlas Marketing Solutions is handling consumer services and operating Corporate Atlas Defendants' websites, Atlas Investment Ventures is handling enrollment services and Provident Solutions is doing business under Atlas Investment Ventures).

Lastly, Plaintiff presents evidence Corporate Atlas Defendants commingled funds and transferred assets amongst each other. (*See* ECF No. 203-1, Exs. 5, 6, and 7 (Atlas Investment Ventures balance sheets from 2022, 2023, and 2024 showing Atlas Investment Ventures transferred money to and from Provident Solutions, Atlas Marketing Solutions, DiRoberto, and Petersen); *see also* ECF No. 247-2, Ex. 177 at 194:6–13 (May 6, 2025 Petersen Deposition Transcript describing moving among the businesses for "overrides for affiliates" and says it was "all in one big bucket.").

Corporate Atlas Defendants contest:

> Although there may be common ownership and shared office space, each of the Atlas Entities have their own distinct legal and operational identities with clear divisions of responsibilities and separate financial accounts, demonstrating a real distinction between each of the Atlas Entities.

(*See* ECF No. 239 at 24:17–20.)

Corporate Atlas Defendants assert each company maintained its own books and financial accounts, and performed distinctive services (*e.g.*, marketing vs. document preparation). (*Id*. at 24:21–25:11.) However, Corporate Atlas Defendants fail to address DOJ's evidence that they share common business objectives and operations (*i.e.*, marketing and selling debt validation letter services) or that they have common ownership and control by Individual

- 22 -

Atlas Defendants. *See, e.g., Fed. Trade Comm'n v. Triangle Media Corp.*, No. 18CV1388-MMA (NLS), 2018 WL 4051701, at *12 (S.D. Cal. Aug. 24, 2018), *aff'd sub nom. Fed. Trade Comm'n v. Hardwire Interactive, Inc.*, 765 F. App'x 184 (9th Cir. 2019) ("When the operations of the Defendant companies are considered as a whole, it appears that they function as a common enterprise. All were controlled by the same primary parties, shared employees and resources, commingled corporate funds, and appear to transact business through a maze of interrelated companies.").

Thus, finding that Corporate Atlas Defendants failed to raise triable issues, the Court **GRANTS** Plaintiff's motion for summary judgment regarding Corporate Atlas Defendants' common enterprise liability regarding Counts I, III, IV, and V.

### 6.   Counts I, III, IV, and V: Individual Atlas Defendants' Liability

Under the FTC Act, individuals may be liable for both injunctive and equitable monetary relief. To obtain injunctive relief, Plaintiff must show a defendant participated directly in the violations at issue or had authority to control them. *F.T.C. v. Pub'l Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997).

An individual may be liable for monetary damages if, in addition to fulfilling the injunctive requirement, he or she also "had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted." *F.T.C. v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138 (9th Cir. 2010) (quoting *Pub'l Clearing House*, 104 F.3d at 1170). Plaintiff can establish the knowledge requirement by showing a defendant had actual knowledge of the violation, was recklessly indifferent, or was aware of a high probability of fraud and intentionally avoided the truth. *Network Servs. Depot, Inc.*, 617 F.3d at 1138–39.

"[T]he same or similar standards governing individual liability for corporate violations of § 5 of the FTC Act also govern individual liability for corporate violations of the Telemarketing Sales Rule." *See F.T.C. v. Ivy Cap., Inc.*, 616 F. App'x 360, 360-61 (9th Cir. 2015) (Mem. Disp.) (upholding, without differentiation, findings of individual liability

23cv313

for corporate violations of § 5 of the FTC Act and the Telemarketing Sales Rule); *see also Consumer Fin. Prot. Bureau v. Wen*, No. 23-55700, 2025 WL 2254521, at *1 (9th Cir. Aug. 7, 2025) (Mem. Disp.) ("Wen may be held individually liable for the Company's violations of the . . . TSR if '(1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth.' ") (citing *CFPB v. CashCall, Inc.*, 35 F.4th 734, 749 (9th Cir. 2022)).

The Court finds Plaintiff has met its initial burden to demonstrate Individual Atlas Defendants, at the very least, had the authority to exercise exclusive control over Corporate Atlas Defendants' TSR and FTC Act violations in Counts I, III, IV, and V.  Thus, Plaintiff has met its initial burden to move for summary judgment as to Individual Atlas Defendants' liability for injunctive relief.  *Pub'l Clearing House, Inc.*, 104 F.3d at 1170.   The Court also finds Plaintiff has met its initial burden to show that Individual Atlas Defendants "had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct" that resulted in consumer injury—such that Plaintiff can move for actual damages. *Network Servs. Depot, Inc.*, 617 F.3d at 1138.

In ruling on a motion to dismiss earlier in this case, this Court previously found the following allegations militated toward finding Individual Atlas Defendants are individually liable: (1) Petersen and DiRoberto are co-owners of Corporate Atlas Defendants; (2) Petersen helped draft scripts for the prerecorded messages; (3) DiRoberto's alleged involvement in prior TSR litigation; and (4) Petersen's alleged participation in an FTC investigational hearing related to Atlas's debt relief service and representations about it. *See Stratics*, 721 F. Supp. 3d at 1102.

Plaintiff has since obtained evidence supporting the above allegations.  Parties' Joint Statement of Undisputed Material Facts states Individual Atlas Defendants exercise exclusive control and ownership over Corporate Atlas Defendants.  (*See* ECF No. 257 at 2:7-15.)  In addition, deposition transcripts confirm Petersen helped edit scripts for the

23cv313

prerecorded messages; and both Individual Atlas Defendants had final approval over these scripts. (*See* ECF No. 213-3, Ex. 12 at 94:10-21 and 96:16–97:8 (Individual Atlas Defendants had meetings discussing the content of RVM transcripts); ECF No. 213-3, Ex. 4 at 276:1–18 (Individual Atlas Defendants had authority to change what telemarketers were saying to customers); ECF No. 213-3, Ex. 11 at 142:9–12 (transcript stating that Individual Atlas Defendants were in charge of marketing at Corporate Atlas Defendants).

Moreover, Plaintiff demonstrates DiRoberto co-owned American Satellite, a company that had also used ringless voicemails as a marketing method during DiRoberto's tenure and that was subsequently found by the Central District of Illinois to be in violation of the TSR for its use of ringless voicemail (ECF No. 213-3, Ex. 15 at 35:14–37:19). *See U.S. v. Dish Network LLC*, 256 F. Supp. 3d 810, 927 (C.D. Ill. 2017) ("Dish caused American Satellite to make many Abandoned Prerecorded Calls in violation of the TSR."). The litigation in the Central District of Illinois implicating DiRoberto's company in TSR violations for RVMs left during DiRoberto's ownership of that company further evinces DiRoberto was "recklessly indifferent" to potential TSR violations subsequently resulting from Corporate Atlas Defendants' use of RVMs. *See Dish Network LLC*, 256 F. Supp. 3d at 927.

Plaintiff has also presented evidence Petersen was aware of consumer complaints as to the likely unlawfulness of the RVMs. Plaintiff has additionally presented a transcript of Petersen's participation in an FTC investigation hearing on April 30, 2021 related to Corporate Atlas Defendants' representations. (ECF No. 213-3, Ex. 10.)

In addition to the continuation of Atlas' infringing activities after Petersen's participation in this FTC hearing, Petersen (and DiRoberto) worked together to retain legal counsel in response to consumer complaints about potential violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227. (ECF No. 213-4, Ex. 26 at 68:7–15 (When asked what prompted Corporate Atlas Defendants to retain legal counsel during his FTC investigational hearing, Kenan Azzeh replied Petersen "wanted to make sure everything we were doing was compliant."); *see also* ECF No. 213-5, Ex. 103 at 1, 4 (law firm letter

23cv313

from Allen, Mitchen & Allen, addressed to DiRoberto, advising Atlas Defendants to obtain express written consent from RVM recipients prior to contact to mitigate any potential risk of prosecution from the FCC and the FTC).)  Atlas Defendants' legal counsel then advised Atlas Defendants to send RVMs only to consumers providing express consent to avoid litigation risk from FTC and FCC enforcement—which Petersen and DiRoberto still failed to do prior to leaving subsequent RVMs.  (*Id*.)

This demonstrates: (1) awareness by Individual Atlas Defendants that consumers were being illegally deceived; and (2) Individual Atlas Defendants had failed to obtain express consumer consent to prevent such illegal deceptions.  *See F.T.C. v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (imposing individual liability where the defendant was informed that sales representatives were misleading consumers); *F.T.C. v. MacGregor*, 360 F. App'x 891, 894–95 (9th Cir. 2009) (imposing individual liability where the defendant "likely knew of material misrepresentations...or was at least recklessly indifferent to the truth" given "evidence showing the high volume of consumer complaints, [and] the high refund and return rates..."); *see also, e.g., F.T.C. v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1284 (S.D. Fla. 2019) (granting summary judgment on individual liability where defendants were officers of a small, closely held corporation and were actively involved in that corporation's business affairs, and monitored customers' negative reviews and credit card chargebacks).

Individual Atlas Defendants fail to raise triable issues as to their individual liability for injunctive relief.  *See Pub'l Clearing House, Inc*., 104 F.3d at 1170.  Individual Atlas Defendants do not dispute that they had the ultimate authority over Corporate Atlas Defendants to control or approve those misrepresentations (*see, e.g.,* ECF No. 257 at 2:7–15; ECF No. 213-3, Ex. 4 at 276:1–18).

Individual Atlas Defendants also fail to raise triable issues as to their individual liability for damages.  (*Id*.)

First, Individual Atlas Defendants attempt to downplay their knowledge as to the misleading nature of the representations violating the FTC Act and TSR in Counts I, III,

- 26 -

IV, and V.   Individual Atlas Defendants assert they were unaware of <u>systematic</u> wrongdoing by Corporate Atlas Defendants and that they were <u>minimally</u> involved in consumer complaints.  (ECF No. 239 at 25:13–27:11.)  In their own motion for summary judgment, Individual Atlas Defendants also argue that they were not primarily responsible for drafting RVM customer call scripts—having delegated marketing and sales to contractors.  (ECF No. 209 at 12–14.)

However, Individual Atlas Defendants concede they were "made aware of the occasional issues [regarding Atlas' deceptive misrepresentations] that would arise," but characterize these issues as isolated and promptly "resolved... as soon as they arose." (ECF No. 239 at 25, n. 153.)  Regardless of how severe Individual Atlas Defendants thought the consumer deception was or how involved Individual Atlas Defendants were in the actual drafting of Provident Solutions Program marketing materials, Individual Atlas Defendants were aware of at least several consumer complaints regarding their debt relief services, retained an attorney for advice on how to deal with those complaints, and then failed to follow attorney advice on best practices (*e.g.*, obtaining express written consent prior to leaving RVMs) (Ex. 103).  These facts demonstrate Individual Atlas Defendants were, at least, acting in reckless disregard of the TSR and FTC violations.

Individual Atlas Defendants also argue in their opposition to Plaintiff's motion for summary judgment and in their own motion for summary judgment that, since they relied upon legal advice in leaving RVMs, they could not have reasonably known that those RVMs could violate the TSR and FTC Act.  (ECF Nos. 239 at 25:13–27:11; 209 at 12–14.)  The Court disagrees.   Mistake-of-law is " 'not a valid defense on the question of knowledge' required for individual liability."  *F.T.C. v. Grant Connect, LLC,* 763 F.3d 1094, 1102 (9th Cir. 2014) (quoting *Cyberspace.com,* 453 F.3d at 1202) (denying individual defendant's advice of counsel defense to FTC Act claims and further elaborating that even if it were valid, defendant "did not rely on counsel's advice in any sense . . . Instead, he responded that 'the pages [we]re fine,' put his hands over his ears, and refused to discuss the matter further.").

23cv313

For the reasons above, Individual Atlas Defendants have not raised triable issues as to their knowledge—or at least reckless disregard—of Corporate Atlas Defendants' violative misrepresentations and subsequently, they are individually liable for monetary damages. For the same reasons, Individual Atlas Defendants failed to meet their initial burden to move for summary judgment.

Thus, the Court **GRANTS** Plaintiff's motion for summary judgment as to Individual Atlas Defendants' individual liability regarding Counts I, III, IV, and V. (ECF No. 213.) In addition, the Court **DENIES** Individual Atlas Defendants' motion for summary judgment. (ECF No. 209.)

**7.      Counts I, III, IV, and V: Atlas Defendants' Civil Penalties, Consumer Redress, Injunctive Relief**

**i.      Consumer Redress**

Section 19 of the FTC Act authorizes courts to order "such relief as the court finds necessary to redress injury to consumers." 15 U.S.C. § 57b(b); *see also AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 593 U.S. 67, 73 (2021); *Fed. Trade Comm'n v. Hanley*, No. 20-15143, 2022 WL 187848, at *1 (9th Cir. Jan. 20, 2022). "[S]ection 19 of the Act separately and specifically authorizes the FTC to seek monetary relief to address violations of certain rules, including the TSR." *Fed. Trade Comm'n v. Elegant Sols., Inc.*, No. 20-55766, 2022 WL 2072735, at *2 (9th Cir. June 9, 2022).

To obtain consumer redress under Section 57b of the FTC Act, the Government need only claim the existence of rule violations, with no state-of-mind requirement. *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1170–71 (C.D. Cal. 2021); *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 603 (9th Cir. 1993). Importantly, Plaintiff "need not prove that every consumer was injured" to obtain redress. *F.T.C. v. Stefanchik*, 559 F.3d 924, 939 & n.12 (9th Cir. 2009). A presumption of actual reliance arises once Plaintiff demonstrates Defendants made material misrepresentations, they were widely disseminated, and consumers bought Defendants' product. *Figgie Int'l*, 994 F.2d at 605–06. The appropriate measure of consumer redress in this case is Defendants' net revenues.

- 28 -

23cv313

*F.T.C. v. Com. Planet, Inc.*, 815 F.3d 593, 603 (9th Cir. 2016), *abrogated on other grounds by AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. ——, 141 S. Ct. 1341 (2021).

### a.    Statute of Limitations

All Parties cite Section 57b(d) of the FTC Act for a three-year statute of limitations period.  (*See* ECF No. 213-1 at 46:12–13; ECF No. 239 at 18:4–7, n. 107.)  Further, both Parties agree tolling agreements (ECF No. 213-5, Exs. 135–136) set a tolling date of June 23, 2022.  (*See* ECF No. 213-1 at 46:12–13, n. 12; ECF No. 239 at 18:4–7.)  All Parties thus set forth a redress window of June 23, 2019 to present.  (*See* ECF No. 213-1 at 46:12–13; ECF No. 239 at 18:6–7.)

### b.    Analysis

Since Plaintiff's summary judgment motion is granted as to Atlas Defendants' misleading representations to consumers under the FTC Act (Count I) and TSR (Count V), the Court finds Plaintiff has met its initial burden on summary judgment that consumer redress is warranted under Section 57b of the FTC Act.

Plaintiff proposes an amount of $13,567,320.33 in consumer redress against Atlas Defendants—allegedly calculated net revenues from June 23, 2019 to the present.  However, even when invited to do so at oral argument, Plaintiff's counsel seemed unable to explain where this number came from, pointing only to Exhibits 72, 98 and 99 lodged in support of its motion for summary judgment without explanation.  (ECF No. 279.)

Taking Exhibit 72 as an example and turning to the first entry, it appears client "P.R." made a first-time payment of $398 and then a monthly payment of $397.44 from 9/9/19 until she cancelled on 11/5/19.  (ECF No. 213-5, Ex. 72.)  Thus, it appears her total payments were only $795.44.  (*Id.*)  Yet the spreadsheet lists her total fee as $8,465.24.  (*Id.*)  It is unclear whether this is the total she would have paid if she had not cancelled her contract or how this number was derived.

Put differently, the ultimate amount Plaintiff seeks in this case appears to be adding the total fees not necessarily the amount actually paid.  Further, it is unclear whether the total fees are what was paid from Ace Defendants to Atlas Defendants or whether some

- 29 -

23cv313

percentage of this was retained by Ace Defendants. Moreover, though Plaintiff seeks $13,567,320.33 in net revenues, Exhibit 72 lists the total fees collected from consumers as $13,772,667.89.

Exhibits 98 and 99 are even more unclear. Although the spreadsheets contain a column referring to various "Program Fee[s]," the Court cannot discern from the spreadsheets alone how the listed values comprise net revenue received by Atlas Defendants. *See Independent Towers of Wash. V. Washington,* 350 F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs"), citing *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991). This applies equally to spreadsheets attached to motions for summary judgment.

As movant for summary judgment, it is Plaintiff's burden to demonstrate how they calculate the amount of the requested consumer redress. The amount of requested consumer redress, thus, remains to be determined at trial.

* * *

For the reasons above, the Court **GRANTS** Plaintiff's motion for summary judgment that it can seek consumer redress against Atlas Defendants. (ECF No. 213.) But, **DENIES** Plaintiff's motion for summary judgment as to the amount of consumer redress. (ECF No. 213.)

### ii.    Civil Penalties

Under Section 45(m)(1)(A) of the FTC Act, a defendant "shall be liable for a civil penalty of not more than [$53,088] for each violation" of an FTC rule, committed "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." *See* 15 U.S.C. § 45(m)(1)(A) ("[S]uch person, partnership, or corporation shall be liable for a civil penalty of not more than $10,000 for each violation."); *see also* 16 C.F.R. § 1.98(d) (2025) (adjusting to $10,000 to $53,088 for each violation to account for inflation). In determining the amount of a civil penalty, the Court is required to consider the following factors: the degree of

23cv313

culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require.  15 U.S.C. § 45(m)(1)(C).

"Under 15 U.S.C. § 45, as modified by 16 C.F.R. § 1.98 (2009), the FTC can recover civil penalties in a district court of the United States against defendants who knowingly violated any relevant rule respecting unfair or deceptive acts or practices"—including for violations of the TSR. *F.T.C. v. Jones*, No. SACV170058DOCJCGX, 2017 WL 11198503, at *6 (C.D. Cal. May 25, 2017) (awarding civil penalties under Section 45 for TSR violations).

Proof of defendants' subjective mental state or that the defendant acted with willfulness or the specific intent of violating the law is not required.  Rather, a defendant is liable if a reasonable, prudent person "should have known" the act was unlawful. *F.T.C. v. Uber Techs., Inc.*, No. 25-CV-03477-JST, 2026 WL 976077, at *11 (N.D. Cal. Apr. 10, 2026) (citing *Dish Network LLC*, 954 F.3d at 978–79); *F.T.C. v. Dave, Inc.*, No. 2:24-CV-09566-MRA-AGR, 2025 WL 2698698, at *18 (C.D. Cal. Sept. 12, 2025) (finding the same and noting "the Ninth Circuit has not considered the issue"); *United States v. Adobe, Inc.*, 791 F. Supp. 3d 966, 988 (N.D. Cal. 2025) ("A defendant is responsible where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision") (internal quotations omitted).

### a.     Statute of Limitations

Separate from the three-year redress period, Plaintiff invokes 28 U.S.C. § 2462 as a *five-year* statute of limitations for civil penalties.  (ECF No. 213-1 at 47:25–26.)  The relevant limitations period for civil penalties then, is June 23, 2017 to present.  (*Id.*) 15 U.S.C. § 45(m)(1)(A) does not contain a statute of limitations.  Thus, 28 U.S.C. § 2462 supplies a *five-year* statute of limitations to Plaintiff's request for civil penalties. *F.T.C. v. Braun*, No. 20-CV-4432 (JSR), 2024 WL 449288, at *10 (S.D.N.Y. Feb. 6, 2024), *appeal withdrawn*, No. 24-698, 2024 WL 2965257 (2d Cir. May 31, 2024) ("A five-year statute of limitations applies to the FTC's recovery of civil penalties [under Section 45(m)(1)(A)]"); *Gabelli v. S.E.C.*, 568 U.S. 442, 444 (2013) (28 U.S.C. § 2462 supplies

23cv313

the "general statute of limitations for civil penalty actions"); *United States v. Gibson Wine Co.*, No. 1:15-CV-1900-AWI-SKO, 2016 WL 1626988, at *7 (E.D. Cal. Apr. 25, 2016) (quoting 28 U.S.C. § 2462) ("A five-year statute of limitations applies to any action 'for the enforcement of any civil fine, penalty, or forfeiture' where a specific limitations period has not been set").

Plaintiff has met its initial burden that a five-year statute of limitations applies to civil penalties for violations of the FTC Act and TSR. 15 U.S.C. § 45(m)(1)(A); 28 U.S.C. § 2462. Atlas Defendants have not raised any issues regarding why the three-year statute of limitations in 15 U.S.C. § 57b(d) for consumer redress should also apply to civil penalties sought via 15 U.S.C. § 45(m)(1)(A).

Thus, the Court applies the five-year period for the statute of limitations for civil penalties—meaning civil penalties start to run for violative conduct beginning from June 23, 2017 to present.

### c.    Atlas Defendants (Knowledge)

Plaintiff met its initial burden that civil penalties are owed under Section 45(m)(1)(A) of the FTC Act, given Atlas Defendants' "actual" or "fairly implied" knowledge about the misrepresentations in the RVMs and other marketing endeavors.

For the same reasons the Court finds Individual Atlas Defendants had sufficient knowledge for individual liability *supra* § III.A.6, the Court also finds Atlas Defendants have the requisite "actual" or "fairly implied" knowledge as to the FTC Act and TSR violations for recovering civil penalties under Section 45(m)(1)(A) of the FTC Act.[2] Atlas

---

[2] Individual Atlas Defendants' knowledge can be imputed into Corporate Atlas Defendants' knowledge under Section 45(m)(1)(A)—since Individual Atlas Defendants are co-owners of Corporate Atlas Defendants, they are Corporate Atlas Defendants' agents. *Cf. Dish Network L.L.C.*, 954 F.3d at 978 ("The knowledge of the agent is imputed to the principal" for purposes of corporate liability" under Section 45(m)(1)(A) of the FTC Act—with the "agent" being order-entry retailers); *cf. also Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985) ("As an inanimate entity, a corporation must act through agents" and "top management" is typically considered a corporation's agent for purposes of attorney-client privilege); *cf. also Biovill Co. v. Oh,* No. 2:23-CV-07920-SVW-JC, 2024 WL 4720873, at *7 (C.D. Cal. Oct. 3, 2024) (citing *Doe v. Roman Cath. Archbishop of Los Angeles*, 202 Cal. Rptr. 3d

Defendants fail to raise triable issues that they do not owe civil penalties for the same reasons they failed to raise triable issues *supra* § III.A.6.

### d.    Atlas Defendants (Amount)

Plaintiff seeks Atlas Defendants' net revenue for the five-year statute of limitations period (June 23, 2017 to present), rather than the supposed statutory maximum of "well over 3 trillion dollars" (62 million calls= 62 million violations × $53,088).

Plaintiff calculates the net revenue to be $22,608,723.27. (ECF No. 213-1 at 48:14–15.) But, Plaintiff concedes that "relevant financial records produced by Defendants date only to September 1, 2019" in Exhibit 98. So, Plaintiff also proposes $18,821,181.35 as a cap for damages. Again, the Court is unable to determine how the Government calculates this amount. Admittedly, the Atlas Defendants' degree of culpability and history of prior conduct weigh in favor of imposing a substantial civil penalty, but the Government offers no suggestion for an amount tied to reality. Hence, the Court declines to wade into speculative numbers and finds there is a triable fact as to the appropriate amount of civil penalty.

\* \* \*

For the reasons above, the Court **GRANTS** Plaintiff's motion for summary judgment that it can seek civil penalties against Atlas Defendants. (ECF No. 213.) But, the Court **DENIES** Plaintiff's motion for summary judgment as to the amount of civil penalties. (*Id*.) Moreover, the Court **DENIES** Individual Atlas Defendant's motion for summary judgment that it does not owe civil penalties. (ECF No. 209.)

### iii.    Injunctive Relief

Section 13(b) of the FTC Act provides "in proper cases the Commission may seek, and, after proper proof, the court may issue, a permanent injunction" against violations of "any provision of law enforced by the Federal Trade Commission." 15 U.S.C. § 53(b); *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994) (construing Section 13(b)

---

414, 426 (Ct. App. 2016)) (for purposes of fiduciary duty, "every member of a member-managed LLC is an agent of the LLC").

23cv313

and Section 53(b) together). A permanent injunction is appropriate when there is a "cognizable danger of recurrent violation" that goes beyond a "mere possibility." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

In determining whether a defendant is likely to engage in similar violations in the future, courts consider (1) the "deliberateness and seriousness of the present violation," (2) the defendant's history of prior violations, and (3) the "adaptability or transferability" of the practice to other products. *Sears, Roebuck & Co. v. F.T.C.*, 676 F.2d 385, 392 (9th Cir. 1982). "The more egregious the facts with respect to a particular element, the less important it is that another negative factor be present. In the final analysis, [courts] look to the circumstances as a whole and not to the presence or absence of any single factor." *Id.*

As for the scope of injunctive relief, Section 16(a) "gives the federal courts broad authority to fashion appropriate remedies for violations of the Act." *Pantron I Corp.*, 33 F.3d at 1102. An injunction "will be upheld so long as it bears a 'reasonable relation to the unlawful practices found to exist.' " *Grant Connect*, 763 F.3d at 1105 (quoting *Colgate-Palmolive Co.*, 380 U.S. at 394–95).

Plaintiff met its initial burden that summary judgment as to its request for injunctive relief is warranted against Atlas Defendants for the following reasons.

First, Plaintiff has demonstrated that the "present violation" is both "deliberate[] and serious[]." *Sears, Roebuck & Co.*, 676 F.2d at 392. Regarding the serious nature of Atlas Defendants' misrepresentations, Plaintiff claims Atlas Defendants "targeted highly vulnerable consumers, used numerous promises and high-pressure tactics to peddle their services, and then failed to deliver on those promises, leading their customers to bankruptcy and lawsuits." (ECF No. 213-1 at 43:25–44:3; *see also* ECF No. 230-1, Ex. A at 37:18-22 (Consumer Nathanael Wassmann testified at his July 18, 2025 deposition that after signing up with Provident, he ended up in further debt and "had to file bankruptcy"); ECF No. 213-5, Ex. 112 (U.S. Bankruptcy Court ruling demonstrating that on October 2017, a Chapter 7 bankruptcy trustee, on behalf of two consumer debtors, sued Reliance Solutions—another company formerly run by Petersen and DiRoberto—and Ace Business Solutions in Illinois

23cv313

Bankruptcy Court alleging fraudulent transfer for fees paid for services never rendered, resulting in a default judgment against both companies).)

Regarding the deliberate nature of Atlas Defendants' misrepresentations, Atlas Defendants purportedly continued to misrepresent their services "despite dozens of warnings from regulators, several lawsuits, and numerous consumer complaints." (*Id*. at 44:2-3; ECF No. 213-5, Ex. 113 (A Georgia consumer sued Barnes, supposedly d/b/a Provident Solutions, for alleged violations of Georgia's Debt Adjustment Act and Unfair and Deceptive Practices Towards the Elderly Act); ECF No. 213-5, Ex. 111 at 782:13–783:12 (Ace Defendants' other "pending, concluded, and threatened legal actions"— including at least one involving Tek Ventures, LLC as a party and an investigation initiated by the Nevada Department of Consumer Affairs); ECF No. 213-5, Ex. 117 (consumer complaint threatening legal action against Tek Ventures, LLC after being sued by her creditor following two years of payments to Provident).

Second, based partially upon the lawsuits described above, Plaintiff has claimed that Atlas Defendants had a history of prior violations for the same conduct. *Sears, Roebuck & Co.*, 676 F.2d at 392.

Evidence of all prior violations follows:

1. Tek Ventures, LLC has been previously investigated for similar misrepresentations regarding the Provident Solutions Program. (*See, e.g.*, ECF No. 213-5, Ex. 111 at 782:13–783:12.) Given that the Provident Solutions Program is run by all Atlas Defendants, they should have all been aware of potential violations.

2. DiRoberto co-owned American Satellite, a company that had also used ringless voicemails as a marketing method during DiRoberto's tenure and that was subsequently found by the Central District of Illinois to be in violation of the TSR for its use of ringless voicemail (ECF No. 213-3, Ex. 15 at 35:14-37:19). *See U.S. v. Dish Network LLC*, 256 F. Supp. 3d 810, 927 (C.D. Ill. 2017) ("Dish caused American Satellite to make many Abandoned

- 35 -

23cv313

Prerecorded Calls in violation of the TSR"); *aff'd in part, Dish Network L.L.C.*, 954 F.3d 970 (7th Cir. 2020) (also finding Dish was liable as principal for retailers violation of TSR that prohibited telemarketing calls to persons who previously indicated that did not wish to receive such calls).

3. A default judgment was entered against a prior company co-owned by Petersen and DiRoberto for fraudulent monetary transfers from consumers' accounts to their companies' accounts, pursuant to 11 U.S.C. §§ 548, 550. ECF No. 213-5, Ex. 112 (Default Judgment in *Eggmann v. Reliance Solutions, Inc., et al.* (Ill. Bankr., Case No. 17-30793-lkg)); ECF No. 230 at 11 n. 6 (Ace Business Solutions, LLC's opposition to DOJ MSJ states that Reliance Solutions, Inc. is "another company owned by Defendants Petersen and DiRoberto that preceded Provident").

Even though some of the legal actions described above involve violations of laws other than the TSR or FTC Act, remaining Atlas Defendants' 'ready willingness to flout the law' as sufficient cause for concern regarding further, additional violations' [here, violations of the TSR and FTC Act] for which injunctive relief may be appropriate." *F.T.C. v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1232 (D. Nev. 2011) (quoting *Sears*, 676 F.2d at 392), *aff'd in part, vacated in part & remanded on other grounds*, 763 F.3d 1094 (9th Cir. 2014).

Because of the serious and deliberate nature of the misrepresentations evinced here, as well as Atlas Defendants' willingness to violate the law in their business ventures, the Court finds Plaintiff has met its initial burden that it can seek injunctive relief against Atlas Defendants. *See Sears, Roebuck & Co.*, 676 F.2d at 392.

Plaintiff seeks the following forms of injunctive relief against Atlas Defendants:

1. A permanent ban on advertising, marketing, promoting, offering for sale, or selling any debt relief product or service;

2. A permanent ban on telemarketing;

23cv313

3. A permanent ban on making misrepresentations or unsubstantiated claims in connection with promoting or offering for sale any product or service; and

4. Recordkeeping and compliance provisions, to allow the government to monitor Atlas's compliance with the injunction.

The government "is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. Having been caught violating the [FTC] Act, respondents must expect some fencing in," *F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) (internal citation and quotations omitted), meaning injunctive relief "barring violators from participating in certain lines of business or forms of marketing," *F.T.C. v. John Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006, 1012 (C.D. Cal. 2012).

Court-ordered "fencing-in" measures include reporting, monitoring, and recordkeeping to ensure compliance with injunctive provisions and prohibiting defendants from disclosing or benefiting from previously obtained customer information. *See, e.g., John Beck*, 888 F. Supp. 2d at 1016–17 (requiring submission of compliance reports to the FTC for 20 years); *Springtech*, 2013 WL 5955395, at *4 (prohibiting defendants from benefiting from customer information, requiring defendants to submit compliance reports and other notices, and requiring defendants to comply with the FTC's future efforts to monitor compliance); *CFPB v. Nesheiwat*, 2022 WL 17958636, at *3 (9th Cir. Dec. 27, 2022) (upholding injunction enjoining defendant from engaging in debt relief services and telemarketing); *F.T.C. v. Mortgage Relief Advocates LLC*, 2015 WL 11257575, at *9 (C.D. Cal. July 1, 2015) (imposing monitoring requirements).

In addition to the proposed "fencing-in" measures, bans on commercial activity are also appropriate. *Gill*, 265 F.3d at 957–58 (affirming a prohibition on engaging in the credit-repair business in light of the defendants' repeated and continuous violations and the likelihood of future violations); *Dinamica*, 2010 WL 9488821, at *12 (permanently banning defendants from offering loan-modification or foreclosure-relief services and making material misrepresentations in connection with the sale of any good or service).

23cv313

Atlas Defendants argue the Court should deny Plaintiff's request for permanent injunction under Section 13(b) of the FTC Act because: (1) Atlas Defendants are not currently engaged in any business activities; (2) Atlas Marketing ceased business operations in 2015; (3) Atlas Investment is no longer marketing the Provident Program, a new consumer has not signed up for the Provident Program since around October 2022 and Tek Ventures, LLC (d/b/a/ "Provident") was dissolved in March 2023, and (4) DiRoberto and Petersen were not personally involved in any of the alleged violations. (ECF No. 239 at 27:20–28:3.)

Regarding Atlas Defendants' purportedly ceased operations, Atlas Defendants do not contest Plaintiff's assertion that Ace Defendants continue to collect fees from Provident Program consumers and that Ace Defendants continued to remit a portion of those fees to Atlas Defendants after Tek Ventures, LLC was formally dissolved (at least until October 31, 2024). (ECF No. 239 at 34:18–19.) Given continued activity by Atlas Defendants and Atlas Defendants' past violations, the Court finds Atlas Defendants have not raised triable issues as to the necessity of the injunctive relief sought by Plaintiff. *F.T.C. v. Gill,* 71 F.Supp.2d 1030, 1047 (C.D. Cal. 1999) (Permanent injunctive relief is appropriate when there is a "some cognizable danger of recurring violation").

Next, the Court has already found that Individual Atlas Defendants can be individually subject to injunctive relief, *supra* § III.A.6. Since Individual Atlas Defendants have previously formed business entities that have been challenged or found to be unlawful even prior to founding Corporate Atlas Defendants, there is no reason to believe they would not continue do so in the future. *F.T.C. v. Com. Planet, Inc.*, 878 F. Supp. 2d 1048, 1055 (C.D. Cal. 2012), *aff'd in part, overturned on other grounds*, 642 F. App'x 680 (9th Cir. 2016), and *aff'd in part, vacated in part on other grounds, remanded on other grounds*, 815 F.3d 593 (9th Cir. 2016) ("The Court finds that a permanent injunction against Mr. Gugliuzza is appropriate because there is a cognizable danger that he will repeat the deceptive and unfair marketing tactics he authorized and implemented with OnlineSupplier").

23cv313

\* \* \*

Thus, the Court **GRANTS** Plaintiff's motion for summary judgment as to injunctive relief against Atlas Defendants. (ECF No. 213.) Further, the Court **DENIES** Individual Atlas Defendants' motion for summary judgment on injunctive relief. (ECF No. 209.)

### 8. Motion for Default Judgment Against Corporate Atlas Defendants (ECF No. 276)

Plaintiff filed a motion for default judgment against Corporate Atlas Defendants on May 2, 2026 (ECF No. 276). The Court entered default against Corporate Atlas Defendants for failure to retain an attorney on May 1, 2026 (ECF No. 274). Notably by then, Parties finished briefing Plaintiff's motion for summary judgment against Corporate Atlas Defendants (ECF Nos. 213, 230, 247).

Since Corporate Atlas Defendants have been placed in default, "it would be inappropriate to deny [Plaintiff]'s summary judgment motion as it relates to [its] affirmative claims against [Corporate Atlas Defendants] simply because [Corporate Atlas Defendants] defaulted after [Plaintiff] filed the motion . . . Doing so would, in effect, penalize [Plaintiff] for conduct by a litigation adversary that was outside [its] control." *Hoppmann v. Pampered Pets & Plants Inc.*, No. CV-22-00427-PHX-DWL, 2024 WL 380973, at \*5 (D. Ariz. Feb. 1, 2024). Furthermore, where reasonably possible, default judgments are disfavored, and cases should be resolved on the merits. *Schwab v. Bullock's Inc.*, 508 F.2d 353, 355 (9th Cir. 1974); *see also Patapoff v. Vollstedt's Inc.* (9th Cir. 1959) 267 F.2d 863, 865; 6 J. Moore, Fed. Prac., P55.10(1)).

Having resolved the same issues in Plaintiff's motion for default judgment (ECF No. 276) in Plaintiff's motion for summary judgment (ECF No. 213), the Court **VACATES AS MOOT** Plaintiff's motion for default judgment regarding Corporate Atlas Defendants' liability and request for consumer redress, civil penalties, and injunctive relief. (ECF No. 276.) Additionally, for the same reasons provided when resolving Plaintiff's motion for summary judgment *supra* §§ III.A.7.i.b, ii.d, the Court **DENIES WITHOUT PREJUDICE** Plaintiff's motion for default judgment against Corporate Atlas Defendants

23cv313

regarding the exact amount of consumer redress and civil liabilities to be awarded. (ECF No. 276.)

### B. Ace Defendants

Plaintiff moves for summary judgment on Count VI (Charging or Receiving a Fee in Advance of Providing a Debt Relief Service, 16 C.F.R. § 310.4(a)(5)(i) (ECF No. 1 ¶¶ 143–145)) against Ace Defendants; and for accompanying civil penalties, consumer redress, and injunctive relief. (ECF No. 213.) Ace Defendants also moves for summary judgment on Count VI, on grounds that: (1) Ace Defendants are not "sellers" under the TSR, (2) Ace Defendants are not "telemarketers" under the TSR, and (3) Ace Defendants do not offer "debt relief services" defined by the TSR. (ECF No. 197.) Plaintiff files a response in opposition. (ECF No. 232.) Ace Defendants file a reply (ECF No. 243), then later filed a corrected reply brief (ECF No. 252).

### 1. Count VI: Charging or Receiving a Fee in Advance of Providing a Debt Relief Service, 16 C.F.R. § 310.4(a)(5)(i) (id. ¶¶ 143–145)

Under 16 C.F.R. § 310.4(a)(5)(i), "sellers" and "telemarketers" are prohibited from requesting or receiving fees for any debt relief service until they have (1) renegotiated or altered a debt on behalf of a consumer, and (2) the consumer has made at least one payment under the altered terms of their loans. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

As a threshold matter, the definitions of "sellers" and "telemarketers" both require defining what "in connection with telemarketing" means in the context of the TSR. A "telemarketer" is "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(hh). A "seller" is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services [*i.e.*, debt validation letters] to the customer in exchange for consideration [*i.e.*, monthly payments]." 16 C.F.R. § 310.2(ee).

Under Section 310.2(ii) of the TSR, "[t]elemarketing" is "a plan, program, or campaign which is conducted to induce the purchase of goods or service . . . by use of one

- 40 -

23cv313

or more telephones and which involves more than one interstate telephone call" (emphasis added).

Here, Ace Defendants could have "induce[d]" consumers' purchase of Atlas Defendants' service through either of the following telephone calls covered by the TSR: (1) Quality Control or "QC" calls conducted as part of enrolling consumers in Provident Solutions Program services; and/or (2) retention calls to consumers who wanted to cancel their participation in the Provident Solutions Program.[3]  The Court considers each in turn.

### i.    QC Calls

As this Court previously reasoned, "induce[ment]" includes Ace Defendants' actions to facilitate enrollment in the Provident Program when "the transaction was not complete." *Stratics*, 721 F. Supp. 3d at 1099; *see also* 16 C.F.R. § 310.2(ii).  The Provident Program Agreement and Atlas Defendants' testimony indicate enrollment in the Provident Program is not complete until consumers participate in a Quality Control Call with Ace Defendants. (*See* ECF No. 213-4, Ex. 21 at 279 (Provident Program Agreement ¶ 3(e) stating enrollment in Provident Program is not complete until the consumer does the following things: (a) reviews and signs, (b) agrees to pay via electronic transfer, (c) agrees to the fees, (d) "make[s] the first payment and the payment clears," and (e) "participate[s] in and pass[es] a telephone interview" confirming understanding—the Ace Defendants' Quality Control call); ECF No. 213-3, Ex. 4 at 85:12–18 (Petersen's 30(b)(6) testimony on behalf of Corporate Atlas Defendants, stating: "[o]nce they've gone through that QC call and their welcome call," that is "when it actually is considered a contracted deal," and "not before it[']s QC'd and approved on the back end side does it become a deal").

---

[3] In a Declaration, Barnes states: "Ace did not provide the script that Provident uses in its ringless voicemail marketing. I was only dimly aware (if at all) that Provident was even conducting ringless voicemails, and had no knowledge of the structure or content of any of Provident's marketing efforts" (¶ 75), and more broadly that Ace's responsibilities "[d]o not include marketing or client origination" and that "[u]nder no circumstances is Ace involved in any way with its clients' marketing" (¶¶ 3, 73–74). The government does not contest this; its brief never attributes the RVMs to Ace.

- 41 -

On the one hand, customer accounts, business records, Ace Defendants' own testimony, and the Provident Solutions Program Agreement demonstrate enrollment is not completed prior to Ace Defendants' QC call. (*See, e.g.*, ECF No. 213-4, Ex. 22 (A Provident representative (Richard Keough) wrote in an email to a consumer that although "the execution of the enrollment agreement was Nov 1st," her "effective enrollment date was scheduled for Nov 24th (the initial payment date)"—not the Quality Control call date or the signing date); ECF No. 213-4, Ex. 68 at 34:18–23 (consumer deposition that, after signing the contract, a second person would conduct a QC call "to verify my responses <u>as part of the enrollment process</u>," and that "[a]fter the quality control call ended," she was instructed to send her first payment because Provident "could not start on [her] case until they received a payment") (emphasis added); ECF No. 213-3, Ex. 17 at 152:7–8 (Barnes' 30(b)(6) testimony as Ace's corporate representative stating the Provident Program welcome letter is sent only after QC call marked "complete").) Indeed, Ace conducted the QC calls as a prerequisite to enrolling customers in the Provident Solutions Program. Further, the QC call script indicates Ace Defendants' agents made representation about the Provident Solutions Program during the calls (*e.g.*, "Do you understand that collection efforts will continue until you are 100% complete with our program?"). (ECF Nos. 248 at 5:3–7; 213-4, Ex. 63.)

On the other hand, the Court still finds triable issues remain regarding whether the QC calls were conducted to "induce" the purchase of Atlas Defendants' services, or merely to verify and process enrollment in services for which consumers already agreed to.

First, a factual question remains as to whether consumers already agreed to enroll in the Provident Solutions Program prior to the QC call—given that consumers have already signed the Provident Solutions Agreement prior to the call (ECF Nos. 213-3, Ex. 17 at 144:10–14; 213-4, Ex. 21). *Cf. Consumer Fin. Prot. Bureau v. Stratfs, LLC*, No. 24-CV-40-EAW-MJR, 2024 WL 911518 (W.D.N.Y. Mar. 4, 2024), *aff'd sub nom. Consumer Fin. Prot. Bureau v. Sasson*, No. 24-554-CV, 2025 WL 1554514 (2d Cir. June 2, 2025) (finding notary defendant is not a "seller" under the TSR since it did not make a sales presentation

23cv313

on company defendant's behalf since consumer's decision to enroll is made on the phone with [one defendant's] employee, before the notary is sent to meet with them). Even though the Agreement lists the QC call as one condition prior to enrollment, it is not clear from either the QC call script or the Agreement itself that the QC call is intended to further convince consumers to sign up for the Provident Solutions Program. Additionally, consumer complaints indicate that call representatives instructed consumers to say yes to all questions asked during the QC call—whether or nor they understood the services offered—to continue enrollment. (*See* ECF No. 213-5, Ex. 133 (consumer specialist instructs clients to say yes to everything); ECF No. 213-3, Ex. 13 at 141 (testimony that employees told customers "all of their accounts will be paid in full" and then instructed "them to say yes to everything."); ECF No. 213-4, Exs. 35, 66, 67, 68 (customer complaints stating they were advised to answer yes to all questions and were surprised that Provident Solutions' services did not reduce their debt).

Second, a factual question remains as to whether the QC call script's stated referral of substantive consumer questions to Atlas Defendants means Ace Defendants did not induce consumer enrollment during the QC call. The QC Call script and Ace Defendants' testimony state that Ace Defendants should refer all substantive consumer questions about the Provident Solutions Program to Atlas Defendants during the QC calls. (*See, e.g.,* ECF No. 213-4, Ex. 63 at 480 (The QC call script advises the representative to refer to the enrollment agent only if the customer answers "no" to the question "Do you understand everything that I have explained to you?"); ECF No. 213-3, Ex. 17 at 145:20–22, 188:19–189:7 (If consumer said he or she did not understand the Provident Solutions Programs, Ace Defendants were instructed to "cancel the transaction and refer the customer back to the enrollment agent"); ECF No. 213-4, Exs. 63, 69 at 122:5–24)

Ace Defendants argue Ace Defendants' question referral means that Ace Defendants do not play a role in <u>inducing</u> the sale of Provident Solutions Program services. *Cf. Sasson*, 2025 WL 1554514, at *2 (the Second Circuit affirmed the district court's finding that policies requiring notaries to refer "substantive" customer questions to a separate

- 43 -

23cv313

consultant is evidence that notaries were not defendant's agents for selling debt relief services).

Given that there are outstanding questions of fact regarding whether Ace was convincing consumers to enroll in Provident Program services during the QC calls, triable issues remain as to whether Ace Defendants "induce[d]" the purchase of debt relief services when conducting QC calls.[4]  Indeed, this is an issue more appropriate for trial than for the Court to resolve at summary judgment.  *See, e.g., Furie v. Infowars, LLC*, 401 F. Supp. 3d 952, 967 (C.D. Cal. 2019) (quoting *Gray v. Virga*, No. 12-CV-3006-KJM, 2017 WL 117895, at *9 (E.D. Cal. Jan. 12, 2017)) ("The disputes caused by the competing declarations cannot be resolved without credibility determinations, which are the function of the jury, not of a judge on a motion for summary judgment").

### ii.    Retention Calls

Ace Defendants also conduct "retention calls" to customers who wanted to cancel their participation in the Provident Solutions Program.

Both Plaintiff and Ace Defendants cite the testimony of Amanda Barnes (a data-entry/customer-service employee) describing the retention calls (ECF No. 213-4, Ex. 69 at 156:4–157:4, 157:15–159:11), but draw opposite conclusions (ECF Nos. 213-1 at 37; 230 at 8).  Amanda Barnes testifies that:

> [I]f a client called in and said they couldn't make their payment . . . my procedure would be to put the client into retention and someone else would

---

[4] Ace Defendants also contest that they are not "sellers" because they merely perform "normal-course, back-end servicing work"—such as withdrawing the monthly payments directly from consumers' bank accounts, deducting its own fees, and weekly remitting splits to Atlas Marketing Partners, Inc., Atlas Investment Ventures, LLC, Provident Solutions, and Consumer Legal Services America, Inc.  (ECF No. 230-1 at 18–22; ECF No. 213-3, Ex. 17 (Barnes' 30(b)(6) testimony for Ace Business Solutions, LLC at 63:7–65:11 ("ACH processing is we go in and pull a file and say[] what payments clients have payments due, you know, the next two days . . . [a]nd then we upload that to their bank accounts . . . I charge [consumers] fees, and the fees is taken out of that money").)  This argument is commonly asserted by defendants who plaintiff asserts are "seller" because they "arrange for others to provide," 16 C.F.R. § 310.2(ee), services.  *See, e.g., Grijalva*, 2019 WL 8221076 ("[M]erely acting as a payment processor" and taking a portion of customer's monthly fees does not mean defendant is a "seller" under the TSR).  However, given that Plaintiff has not proposed that Ace Defendants are "sellers" by virtue of "arranging for others" to sell services, the Court does not rule upon this issue.

23cv313

reach out . . . [clients] may have called to just cancel the program, maybe this wasn't for them . . . [m]aybe they wanted to cancel because one of the debts enrolled was their husband's. Well, we have a co-applicant form. We can enroll your husband if you would like, you know. And then at that point, they can choose to do that . . .

[T]here [were] a number of reasons a client – or a consumer may have asked to cancel. Sometimes just reaching out to them and understanding more and presenting an option to them was all they needed.

(ECF No. 213-4, Ex. 69 at 156:4–157:4 (emphasis added).)

While Plaintiff interprets the co-applicant form offer as Ace Defendants' attempt to enroll new clients and debts during retention (ECF No. 213-1 at 19:22–26), Ace Defendants interpret the form offer as part of re-explaining how the Provident Solutions Program functions to a consumer who "might have inadvertently enrolled one of her spouse's debts in the program" (ECF No. 230 at 8:18–22).

In addition, in its motion for summary judgment and opposition to Ace Defendants' motion for summary judgment, Plaintiff provides accounts by Ace Defendants' agents that they offered reduced payments to consumers who called to cancel the Provident Solutions Program so that they would be able to continue services.  (ECF No. 248 at 4:7–12 (citing ECF No. 232-2, Exs. 144 (email from Ace employee to Provident Solutions Program retention branch stating: "[client called in] to cancel because he claims he is laid off [and] can not afford to continue to make payments towards us. I offered to have client[']s account reviewed for a partial of $50 this month."), 145 (another email stating "[client called in] to cancel the program stated she just cannot afford to continue in the program. I offered a partial payment to try and save client")).)

Ace Defendants also assert they only conducted retention calls briefly and stopped in early 2020—since Ace Defendants failed to keep consumers in the Provident Solutions Program.  (ECF No. 230 at 8:23–9:5.)  However, this implies that the purpose of the retention calls was to ensure Provident Solutions Program consumers stayed enrolled.

Further, Plaintiff provides evidence Ace's retention efforts did not end in early 2020—given that Petersen emailed Barnes in August 2022 about a Better Business Bureau

23cv313

("BBB") complaint from a consumer alleging that Provident was not paying her bills instructing her to "[have] someone reach out try to salvage the deal and then respond with customary bbb response," to which Barnes responded that Ace Defendants would "reach out and prepare response." (ECF No. 248 at 4:12–16 (citing ECF No. 235-2, Ex. 168).)

Thus, triable issues of fact also remain as to whether Ace Defendants "induce[d]" the purchase of debt relief services when conducting retention calls and the timeframe in which Ace Defendants conducted those calls.

Since Ace Defendants must have engaged in "telemarketing" under 16 C.F.R. § 310.2(ii) (*i.e.*, must have "induce[d]" purchases) to qualify as "sellers" or "telemarketers" under the TSR (16 C.F.R. §§ 310.2(ee), (hh)), the Court finds triable issues also remain as to whether Ace Defendants qualify as "sellers" or "telemarketers." *Id.* Moreover, the Court does not need to reach whether Ace Defendants offer "debt relief services" under 16 C.F.R. § 16 C.F.R. § 310.2(o).

* * *

For the reason above, the Court **DENIES** Plaintiff's motion for summary judgment (ECF No. 213) and Ace Defendants' motion for summary judgment (ECF No. 197) on Count VI. Further, since Count VI (and related recovery) is the subject of Ace Defendants' motion for summary judgment, the Court **DENIES** Ace Defendants' motion for summary judgment in its entirety.

## IV.    CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for summary judgment. (ECF No. 213.) However, the Court **DENIES** Individual Atlas Defendants' motion for summary judgment (ECF No. 209) and Ace Defendants' motion for summary judgment (ECF No. 197). [5]

More specifically, the Court **GRANTS** Plaintiff's motion for summary judgment (ECF No. 213) on:

---

[5] The Court notes that, for all claims proceeding to trial, the Court does not determine whether the relevant factfinder is the bench or a jury at this stage.

23cv313

1. Count I (15 U.S.C. § 45(a)(1)) against Atlas Defendants;

2. Count III (16 C.F.R. § 310.4(b)(1)(v)(A)) against Atlas Defendants;

3. Count IV (16 C.F.R. § 310.4(d)(1)) against Atlas Defendants;

4. Count V (16 C.F.R. § 310.3(a)(2)(x)) against Atlas Defendants;

5. Corporate Atlas Defendants' common enterprise liability regarding Counts I, III, IV, and V;

6. Individual Atlas Defendants' individual liability regarding Counts I, III, IV, and V;

7. Civil penalties are owed under 15 U.S.C. § 45(a)(1) against Atlas Defendants;

8. Consumer redress is owed under 15 U.S.C. § 57b against Atlas Defendants; and

9. Injunctive relief against Atlas Defendants (see detailed measures below).

The Court **DENIES** Plaintiff's motion for summary judgment (ECF No. 213) on:

1. Fixing the amount of civil penalties owed under 15 U.S.C. § 45(a)(1) against Atlas Defendants;

2. Fixing the amount of consumer redress owed under 15 U.S.C. § 45(a)(1) against Atlas Defendants; and

3. Count VI (16 C.F.R. § 310.4(a)(5)(i)) against Ace Defendants.

The Court **DENIES** Individual Atlas Defendants' motion for summary judgment (ECF No. 209) on:

1. Count III;

2. Civil penalties,

3. Injunctive relief; and

4. Individual Atlas Defendants' individual liability regarding Counts I, III, IV, and V.

Further, the Court **DENIES** Ace Defendants' motion for summary judgment (ECF No. 197) on Count VI.

23cv313

Lastly, the Court **ORDERS** the following injunctive relief measures against Atlas Defendants (Defendants Eric Petersen, Todd DiRoberto, Atlas Marketing Partners, Inc., Atlas Investment Ventures, LLC, and Tek Ventures, LLC):

1. **Permanent Ban on Debt Relief Services**: Atlas Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, are permanently restrained and enjoined from advertising, marketing, promoting, offering for sale, providing, or requesting or receiving payment for any Debt Relief Service, or assisting others in advertising, marketing, promoting, offering for sale, providing, or requesting or receiving any payment for any Debt Relief Service.

2. **Permanent Ban on Telemarketing**: Atlas Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, are permanently restrained and enjoined from advertising, marketing, promoting, offering for sale, providing, or requesting or receiving payment for any Debt Relief Service, or assisting others in advertising, marketing, promoting, offering for sale, providing, or requesting or receiving any payment for any Debt Relief Service.

3. **Prohibitions Against Misrepresentations**: Atlas Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, offering for sale, or selling of any product or service, are permanently restrained and enjoined from making or assisting others in making misrepresentations or unsubstantiated claims, expressly or by implication.

4. **Compliance Reporting**:
   a. For twenty (20) years after entry of this Order, each Atlas Defendant must submit a compliance notice, sworn under penalty of perjury, within fourteen (14) days of any change in the following:

23cv313

     i.  Any change in:  (a) any designated point of contact; or (b) the structure of any corporation or any entity that the Atlas Entities have any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

     ii.  Any change in:  (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which they perform services whether as an employee or otherwise and any entity in which they have any ownership interest, and identify the name, physical address, and any Internet address of the business or entity.

b.  Atlas Defendants must submit to Plaintiff and the Federal Trade Commission ("Commission") notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against any Defendant within fourteen (14) days of its filing.

c.  Any submission to Plaintiff or the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

d.  Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: *United States v. Stratics Networks*.

23cv313

e. Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: *United States v. Stratics Networks*.

f. Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: *United States v. Stratics Networks*.

5. **Recordkeeping**:

a. Atlas Defendants must create certain records for ten (10) years after entry of the Order and retain each such record for ten (10) years. Specifically, the Atlas Entities for any business that they, individually or collectively with any other Defendant(s), are a majority owner or controls directly or indirectly, must create and retain the following records:

   i. Accounting records showing the revenues from all goods or services sold;

   ii. Bank records for all accounts for which Defendant is the signer and/or owner;

   iii. Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name, addresses, telephone numbers, job title or position, dates of service, and (if applicable) the reason for termination;

23cv313

iv. Records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

v. All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission and Plaintiff;

vi. A copy of each unique advertisement or other marketing material; and

vii. Copies of agreements, applications, and contracts with suppliers, payment processors, and list brokers.

**IT IS SO ORDERED.**

**DATED: July 8, 2026**

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**

23cv313